BEST LOCK CORPORATION, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.*

Docket Nos. 54550, 54567, 54571, 60805, 62155, 64623. Filed March 26, 1959.

*Willis K. Kunz., Esq.,* and *Claude M. Spilman, Jr., Esq.,* for the petitioners.

*Robert E. Johnson, Esq.,* for the respondent.

TIETJENS, *Judge:* These consolidated cases involve deficiencies in income tax as follows:

DOCKET NOS. 54567 AND 64623, FRANK E. BEST AND EMILIA A. BEST:

| Year | Deficiency |
|------|-----------|
| 1949 | $7,271.80 |
| 1950 | 25,773.52 |
| 1951 | 29,349.18 |
| 1952 | 33,326.62 |
| 1953 | 31,153.20 |

---

[1] Proceedings of the following petitioners are consolidated herewith: Best Lock Corporation, Docket No. 60805; The Best Foundation, Inc., Docket Nos. 54571 and 62155; Frank E. Best and Emilia A. Best, Docket Nos. 54567 and 64623.

*This Findings of Fact and Opinion supersedes 29 T.C. 389 (1957).

DOCKET NOS. 54550 AND 60805, BEST LOCK CORPORATION:

| Year | Deficiency |
|------|-----------|
| 1949 | $13, 707. 14 |
| 1950 | 27, 496. 74 |
| 1951 | 75, 691. 77 |
| 1952 | 52, 688. 23 |

DOCKET NOS. 54571 AND 62155, THE BEST FOUNDATION, INC.:

| Fiscal year ended June 30 | Deficiency |
|------|-----------|
| 1950 | $4, 854. 18 |
| 1951 | 11, 333. 35 |
| 1952 | 13, 085. 99 |
| 1953 | 17, 178. 69 |
| 1954 | 13, 422. 10 |

The issues in the case of the individual petitioners are whether certain payments made by Best Lock Corporation to the Best Foundation, Inc., were constructive income to Frank E. Best, and whether an amount paid in 1953 by Best to the Foundation is deductible as a charitable contribution.

In the case of Best Lock Corporation the issues are whether such payments made to Best and the Foundation are deductible either as ordinary and necessary business expenses or for depreciation on patents, and whether amounts paid in 1951 and 1952 for the preparation of a catalog published in 1953 represent capital expenditures.

In the case of the Foundation the principal issue is whether it is an organization exempt, pursuant to section 101(6) of the Internal Revenue Code of 1939, from income tax. If it is not so exempt, it will be necessary to determine the taxable income of the Foundation and whether it is entitled to certain deductions claimed. There is also an issue of whether the payments by Best Lock Corporation to the Foundation are income to the Foundation if it is held that they are constructive income to Best.

The taxpayers filed returns for all years at issue with the collector or district director of internal revenue at Indianapolis, Indiana.

In a prior opinion in these cases, 29 T.C. 389, we held that royalties paid by Best Lock Corporation to Frank E. Best and Best Foundation pursuant to licenses granted in 1949 by the Foundation were not deductible by the payor as ordinary and necessary business expenses, following *Thomas Flexible Coupling Co.* v. *Commissioner*, 158 F. 2d 828 (C.A. 3, 1946). Best Lock Corporation manufactured locks under a license issued earlier by Frank E. Best, Inc. The evidence showed that the key-in-the-knob lock, which was the subject of the 1949 licenses, was a necessary part of the Best locking system and in the absence of a showing that the original grant from Best to Frank

E. Best, Inc., did not include additions and improvements such as this, we concluded that the Corporation had the right to manufacture this lock under the original licenses from Frank E. Best, Inc., to it.

After the prior opinion was filed Best and the Corporation moved for a rehearing and asked to be allowed to place in the record the original licenses from Best to Frank E. Best, Inc., not previously introduced. Since three taxpayers are immediately involved and payments continuing for a number of years in the future are called for by the contracts and in order to do justice to all concerned, we granted the motion. Additional evidence was introduced and additional briefs have been filed. For convenience, the Findings of Fact are restated in full with such revisions or additions as appear necessary from the further evidence.

### FINDINGS OF FACT.

Frank E. Best and Emilia A. Best are husband and wife residing at Indianapolis, Indiana.

Best Lock Corporation was incorporated in Delaware and has its principal office in Indianapolis.

Best Foundation, Inc., is a corporation organized in 1949 under the laws of Indiana. Its principal office is in Indianapolis.

Frank E. Best has made a number of inventions and has received approximately 100 patents, most of them in the locking art. The earliest of these involved herein is a patent issued July 5, 1921, a basic patent upon a lock core mechanism which can be removed from the lock and interchanged. From this and other patents Best has developed a locking system which is sold for use in industrial plants and buildings requiring master key systems and replaceable locks.

Best has organized several corporations in connection with the manufacture and marketing of his locking system and other inventions. In 1920 Best Lock Company was organized under the laws of the State of Washington. In 1921 the name of this corporation was changed to Frank E. Best, Inc. The stock in this corporation was issued to Best in exchange for an assignment of his rights to the locking system. Some of the stock was returned to the corporation and sold to the public, but Best retained and still holds more than 50 per cent of the voting stock.

On October 15, 1920, Best assigned to Frank E. Best, Inc., the exclusive patent rights in all foreign countries of certain of his inventions together with "any and all further additions to or improvements in said devices which said Frank Ellison Best may make within ten years from the date of this assignment." In 1922 Best assigned to this corporation all the American rights to such inven-

tions together with any and all additions or improvements made within 10 years from October 15, 1920.

In 1923 Best Universal Lock Co., a Washington corporation, was organized. The controlling stock interest in this corporation is held by Frank E. Best, Inc., which issued a license to this subsidiary to manufacture, use, and sell locking devices and related hardware. Some stock was sold to the public. Best Universal Lock Co. (Washington) manufactured products under the license, and sales were made commencing in January 1925.

In 1928 Automatic Manufacturing Co. was organized under the laws of Delaware. The name of this corporation was later changed to Best Lock Corporation and it is one of the petitioners. The controlling stock is held by Best as trustee for Best Universal Lock Co. (Washington) and some shares are owned individually by Best and his relatives. In May 1928, Frank E. Best, Inc., licensed this petitioner to manufacture, use, and sell products and it replaced Best Universal Lock Co. (Washington) as the manufacturing corporation.

In 1938 Best Universal Lock Co., Inc., was incorporated under the laws of Indiana. Its stock is wholly owned by Best Lock Corporation and it acts as manufacturing and sales agent for its parent for a consideration of 5 per cent of the net profits.

The agreement between Frank E. Best, Inc., as first party, and Automatic Manufacturing Co., as second party, dated May 23, 1928, is captioned License (#4) and provides in part:

WHEREAS, it is desired to provide for a reorganization of the Best Universal Lock Co., and the re-vesting of the right and license granted unto said company by first party, in a new company adapted to carry forward the original objects and purposes of said Best Universal Lock Co., for the benefit of the stockholders and creditors thereof, upon the relinquishment, cessation and/or termination of said right and license thereto; and

WHEREAS Automatic Manufacturing Co., a Delaware Corporation, herein known as second party, is desirous of obtaining the sole and exclusive right, license and authority to manufacture, use and sell, all of said goods, wares and merchandise under the above mentioned system of patents, if and when the aforesaid license to Best Universal Lock Co., shall cease and terminate, as provided in said license.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that first party, for and in consideration of the covenants, agreements and considerations set forth in the collateral AGREEMENT hereto attached as Exhibit "A" does hereby give and grant to Automatic Manufacturing Co., a Delaware Corporation, the second party hereto, in the event and from the time of the relinquishment, cessation or termination of the aforesaid license (Exhibit "B"), the sole and exclusive right and license to make, use and sell within the United States of America goods, wares and merchandise under the Best group of lock patents owned by first party, as fully and to the same extent that the said right and license were ever enjoyed by the Best Universal Lock Co.

This license is in all respects subject to the terms and conditions of the aforesaid license (Exhibit "B") to Best Universal Lock Co., and conveys to second party, in the event and from the time of the relinquishment, cessation and/or termination of the aforesaid license (Exhibit "B"), all the right and license theretofore enjoyed by said Best Universal Lock Co., except insofar as the terms of said license (Exhibit "B") may be modified by the provisions hereof.

This license #4 includes rights under all United States patents and patent applications now or hereafter owned or controlled by Frank E. Best, Inc., and amendments, additions to, or improvements upon said patents and patent applications; provided the above mentioned patents, patent applications, amendments, additions and improvements relate and pertain to the locking contrivances, service devices and manufacturing machinery incident to the manufacture, use, exploitation and sale of the Best Universal Locking System in the United States of America.

     *        *        *        *        *        *        *

It is further understood and agreed that all patents for inventions relating to said Best Universal Locking System hereafter made in the course of the business of either party hereto shall be taken in the name of, or assigned to, FRANK E. BEST, INC., and that license thereon in the United States of America shall upon the relinquishment, cessation and/or termination of the aforesaid license (Exhibit "B") to Best Universal Lock Co. automatically vest in Automatic Manufacturing Co., subject to all the provisions hereof.

This license identified certain patents and patents applied for as covered by the agreement, listing 31 issued patents, 5 patents allowed but not issued, 12 patents applied for, and 4 trademarks issued. The second party agreed to pay all debts of Best Universal Lock Co. with interest before declaring dividends.

In 1928 the name of Automatic Manufacturing Co. was changed to Best Lock Corporation. This corporation manufactured products pursuant to the above license until 1938. The manufacturing and sales of products since then has been carried on by its subsidiary.

In 1940 Best granted to Best Lock Corporation an exclusive license to make, use, and sell in the United States, goods under the Best group of Dynamic Rectifier patent applications. This was identified as License #5 and was for a term ending December 31, 1945. It referred to specified patent applications, including amendments, additions or improvements, and all patents into which the applications might mature. It provided for royalties measured by work done with a minimum royalty of $10,000 for 1940 and $15,000 for each subsequent year payable to Best. No products were manufactured or sold under this license. The license was renewed upon its expiration and Best received the minimum royalty under it through the taxable years.

Best did not at any time sell or license his patents to parties other than corporations he controlled, nor receive royalties from other parties. Prior to 1940 he received salaries from some of these corporations.

On July 6, 1949, Best organized an Indiana nonprofit corporation known as the Best Foundation, Inc., for the following stated purposes:

A. To promote the Christian Religion as taught in the New Testament of the Bible, in the light of the Old Testament.

B. To act as a charitable organization, assisting worthy individuals, institutions, and movements by gifts, loans and otherwise.

C. To increase and disseminate knowledge in every field of legitimate endeavor, particularly in the natural sciences.

D. To endeavor to find ways to extend the useful span of human life and improve human health.

E. To seek to eradicate evils from our body politic, to fight communism and to engender patriotism.

F. To attempt, in general, to do any and all things convenient, desirable and/or necessary to make this world a better place in which to live.

G. To exercise any and all of the general powers conferred on NOT FOR PROFIT CORPORATIONS by the Laws of the State of Indiana which are hereby made a part hereof as fully and completely as though each clause thereof were copied verbatim herein, and particularly as recorded in THE INDIANA GENERAL NOT FOR PROFIT CORPORATIONS ACT. (H. 179. Approved March 7, 1935) and all laws amendatory thereof, including the right to amend these Articles of Incorporations, to dissolve this corporation, to make and amend By-Laws in harmony therewith and to do any and all acts and deeds, desirable, necessary and/or expedient to the accomplishment of the foregoing.

Further, the Certificate of Incorporation provided that:

There shall be three classes of members possessing fifteen to eighteen memberships and votes as follows:

A. There shall be one class A member having 12 memberships and votes at all meetings of members.

B. There shall be one class B member having two memberships and votes at all meetings of members.

C. There shall be one class C member having one membership and vote at all meetings of members.

D. There may be from one to three additional class C members having one membership each and one vote each at each and every meeting of members.

The class A member was Best and thereby he controlled the Foundation.

On July 7, 1949, Best as first party and the Foundation as second party signed an agreement identified as "Exclusive License 7-7-49" which provided:

WHEREAS, I, Frank Ellison Best, of 5802 East Pleasant Run Parkway, Indianapolis 19, County of Marion and State of Indiana, have invented certain inventions pertaining to a KEY-IN-THE-KNOB LOCK WITH PUSH BUTTON CONTROL, identified as the said lock, with all of its many ramifications, now being put in production, by the Best Universal Lock Co., Inc. of Indianapolis, Indiana; and

WHEREAS, I have obtained two Letters Patent pertaining thereto identified as United States Patents, Numbers 2290727 and 2290728, under date of July 21, 1942 on DEAD LOCKING TUBULAR NIGHT LATCHES; and

WHEREAS, I am in the process of obtaining Letters Patent on two United States Patent Applications identified as Serial Numbers 73327 and 93971 for BOX STRIKES; and

WHEREAS, I am contemplating making other Patent Applications on inventions, heretofore by me made, pertaining to various patentable features of the said KEY-IN-THE-KNOB LOCK WITH PUSH BUTTON CONTROL in its many ramifications; and

WHEREAS, The BEST FOUNDATION, Inc, a not for profit corporation of Indiana with offices at 5802 East Pleasant Run Parkway, Indianapolis 19, Indiana, is desirous of obtaining an exclusive license subject to a collateral agreement covering the United States rights thereof, said exclusive license being identified as EXCLUSIVE LICENSE 7-7-49, and said collateral agreement being identified as COLLATERAL AGREEMENT E-L-7-7-49:

Now, THEREFORE, in consideration of one dollar ($1.00), as a consideration for services rendered and to be rendered in connection with Letters Patent hereof, receipt of which is hereby acknowledged and in further consideration of the royalty payments required to me to be paid by the sub-licensee hereof and other considerations set forth in said COLLATERAL AGREEMENT E-L-7-7-49 of even date attached hereto and, by this reference, made a part hereof,

I, FRANK ELLISON BEST, DO BY THESE PRESENTS give and grant unto the said The BEST FOUNDATION, Inc. this exclusive license identified as EXCLUSIVE LICENSE 7-7-49 on each and every United States Letters Patent enumerated above and on each and every United States Letters Patent maturing from and growing out of the afore described Pending Patents and also on each and every United States Letters Patent maturing from and growing out of said unapplied for inventions made heretofore by me, all said Letters Patents pertaining to said KEY-IN-THE-KNOB LOCK WITH PUSH BUTTON CONTROL, for the full life term of each thereof, subject to all of the terms and conditions set forth herein and in said appended COLLATERAL AGREEMENT E-L-7-7-49.

Thus is conditionally conveyed by this instrument to The BEST FOUNDATION, Inc., the exclusive right to make, use and vend the said inventions throughout the United States and the Territories thereof, for the full life term of each of said Letters Patent.

## A collateral agreement signed at the same time provided, in part:

I—First Party hereby gives and grants unto Second Party the EXCLUSIVE LICENSE 7-7-49, attached hereto, and hereby made a part hereof, said license being for the full life term of the Letters Patent thereof, granting the exclusive right to make, use and vend the said inventions throughout the United States and the Territories thereof, subject to all the terms and conditions hereof and thereof.

II—Second Party shall have the right to grant an exclusive sub-license hereunder to the BEST UNIVERSAL LOCK CO., INC., a corporation of the State of Indiana with offices at 10 North Senate Avenue, Indianapolis 4, Indiana, thereby conveying to the said BEST UNIVERSAL LOCK CO., INC. any or all of the patent rights conveyed by the said EXCLUSIVE LICENSE 7-7-49 to Second Party.

III—Second Party hereby agrees to require any sub-licensee hereunder to pay a royalty to the licensor hereof, Frank Ellison Best, in the amount of $500.00 per month on the 15th day of each and every calendar month beginning on July 15, 1949, and terminating on the 15th day of the month next preceding the expiration date of the latest Letters Patent granted or to be granted by the

United States Patent Office, coming under the provisions of this EXCLUSIVE LICENSE 7-7-49.

IV—The parties hereto expressly covenant and agree that the accompanying EXCLUSIVE LICENSE 7-7-49 and this COLLATERAL AGREEMENT E–L–7–7–49, are given and entered into with the express understanding and agreement that should the Second Party, for any reason beyond the control of First Party, fail at any time in good faith to meet its financial obligations or go into receivership or voluntary or involuntary liquidations, THEN, AND IN ANY OF THE SAID EVENTS, or at anytime thereafter during the persistence of any said condition, at the option of First Party, the license granted in said EXCLUSIVE LICENSE 7-7-49 and all rights granted thereunder and hereunder shall forthwith cease and terminate, time being of the essence hereof, whereupon all rights granted thereunder and hereunder shall forthwith revert to the First Party as owner thereof and any sub-licensee thereunder shall thereupon and thereafter treat, and deal directly, with First Party to the entire exclusion of Second Party, time being of the essence hereof, but in no event shall the termination of the said EXCLUSIVE LICENSE 7-7-49 work a termination of any sub-license granted to BEST UNIVERSAL LOCK CO., INC., thereunder.

At the same time documents entitled "Exclusive Sub-license 7-7-49" and "Collateral Agreement E–S–L 7-7-49" were signed, conditionally conveying from the Foundation to Best Universal Lock Co., Inc., the exclusive right to make, use, and vend the inventions described. The inventions mentioned in these documents were two patents issued in 1942 on deadlocking tubular night latches, two patent applications for box strikes, and other patents maturing from these or from other inventions theretofore made by Best "pertaining to various patentable features of the KEY IN THE KNOB LOCK WITH PUSH BUTTON CONTROL." The exclusive sublicense granted by the Foundation to Best Universal Lock Co., Inc., recites, in part:

WHEREAS, The BEST FOUNDATION, Inc. is desirous of raising working capital by borrowing money on six percent and lesser percentage notes and by other evidences of indebtedness all to be amortized out in consecutive equal monthly payments of principal and interest covering such periods of time that all borrowings thus made will be amortized out within the life of this EXCLUSIVE SUB-LICENSE 7-7-49, granted hereby; and

WHEREAS, the said The BEST FOUNDATION, Inc. has no present source of income with which to meet the said amortization payments on said borrowings as they fall due month by month;

Now, THEREFORE, in consideration of one dollar ($1.00), receipt of which is hereby acknowledged, and in further consideration of monthly royalty payments of five thousand dollars ($5000.00) per month, five hundred dollars ($500.00) of which is to be paid directly to the original licensor, Frank Ellison Best, and four thousand five hundred dollars ($4500.00) of which is to be paid directly to the sub-licensor, The BEST FOUNDATION, Inc., for each and every calendar month from date hereof to the expiration date of the latest Letters Patent, to be granted by the United States Patent Office, coming under the provisions of this EXCLUSIVE SUB-LICENSE 7-7-49, as hereinbefore set forth as are more fully set forth in the said attached COLLATERAL AGREEMENT E–S–L–7–7–49,

WE, The BEST FOUNDATION, Inc., DO BY THESE PRESENTS give and grant unto the said BEST UNIVERSAL LOCK CO., INC. an EXCLUSIVE SUB-LICENSE 7–7–49 subject to COLLATERAL ARGEEMENT E–S–L–7–7–49, on each and every United States Letters Patent enumerated and set forth in said EXCLUSIVE LICENSE 7–7–49 given and granted as of this day by Frank Ellison Best, the inventor, to us, The BEST FOUNDATION, Inc. for the full life term of each and every one of said United States Letters Patent as fully and completely and to the same extent that the same has been conveyed to us by the said inventor, Frank Ellison Best.

In a collateral agreement Best Universal Lock Co., Inc., agreed to pay royalties of $500 per month to Best and $4,500 per month to the Foundation and to pay monthly amortization payments on class A notes of the Foundation if the latter defaulted in payment thereof.

In November 1949 the State of Indiana pointed out to the petitioners an apparent illegality of the foregoing agreements for failure to comply with an Indiana statute requiring filing of copies of the letters patent and an affidavit of ownership thereof. Thereupon the parties executed disclaimers of these instruments setting them aside as being of no force and effect and executed new licenses and agreements to the same effect in the State of Ohio, making them retroactive to July 7, 1949.

One activity of the Foundation was assisting religious organizations by the sale of the Foundation's notes. An offer was made that individuals could lend a sum to the Foundation which would issue its note for such amount to be amortized over 180 months with 6 per cent interest and a gift of one-half of such amount would be paid over to a designated religious organization, and that repayment of the principal sum and interest would be guaranteed by Best Universal Lock Co., Inc. Such notes were issued from July 1949 to November 1949. Some of the gifts were made by the lenders directly to the religious organizations. In other cases, the Foundation paid over the amount of the gift. Notes amounting to approximately $78,000 were issued on this basis. Organizations benefiting were American Bible Chautauqua, Memorial Tabernacle Inc., Pottstown Youth Centre Inc., Mennonite Brethren in Christ Church, Berks County Evangelistic Assn., Revival Tabernacle, Youth for Christ, and Englesville Gospel Chapel. From these sales $38,250.27 was contributed to these organizations. Other notes of approximately the amount of $78,000 were issued to other persons at a 50 per cent discount. The foundation realized $78,255 and loaned $75,590.97 to Best Universal Lock Co., Inc.

The notes issued were in the following form:

Amortization Note of                                      Class A Note No. ____
The Best Foundation, Inc.                                              $____
For value received, we promise to pay to the order of _____

_____ Dollars,
together with any legal expense of collection and with interest at the rate of
six percent per annum, amortizing the loan within _____ years by _____ .
consecutive monthly payments, of _____* each, beginning one
month from the date hereof, mailed to the last known post office address of
the holder hereof.

Issued _____ 19____        The Best Foundation, Inc.
* Final Payment $_____
Due _____ 19____       By _____

On the reverse of the note it was stated:

This is one of a series of notes that comes under the provisions of a Patent
Royalty Agreement dated July 7, 1949, between The Best Foundation, Inc., First
Party and Best Universal Lock Co., Inc., Second Party, an excerpt of which
reads as follows:

"Second Party further covenants and agrees that should First Party for
any reason whatsoever, default or fail to make any monthly payment on
any of the said Class A notes of First Party, when due, that Second Party
will make said payment to the holder thereof upon demand without protest
and charge the same to the royalty account of said First Party."

This is your guarantee that Best Universal Lock Co., Inc., will pay this
obligation upon presentation, should The Best Foundation, Inc., for any reason,
fail to mail your monthly amortization check on time.

In December 1949 the Indiana Securities Commission issued an
order to Best Foundation, Inc., to cease and desist from the further
sale of its class A amortization notes, stating that the Foundation had
sold securities without having registered as a dealer and through
agents who were not registered and that it had engaged or was about
to engage in a course of business relating to the sale of securities which
was in violation of law and would operate as a fraud upon the
purchaser. Thereafter the Foundation made no further sales of
amortization notes.

The Foundation kept its books upon the basis of a fiscal year ending
June 30, and upon an accrual method of accounting.

In February 1951 Best and others organized a corporation named
Vigilance, Incorporated, under the laws of Delaware. The certificate
of incorporation stated in part:

THIRD: The general purposes of this Corporation are to establish and operate
a national educational and benevolent organization designed to inform and edu-
cate the public with respect to candidates and prospective candidates for public
office or responsibility, and with respect to all issues and matters of public
interest or concern, and with respect to all voting problems; and to benevolently
solicit and assist desirable persons to qualify as candidates for public office or
responsibility irrespective of party affiliations; and, by any and all means, to
initiate, aid, further and encourage benevolent reforms of any nature whatsoever.

Under the plan of organization Best held 32 of 40 memberships and
thereby controlled the corporation. No capital stock was to be issued
and no dividend paid.

The Foundation supplied funds to Vigilance, Inc., in the amount of $32,600 in 1951, $40,701 in 1952, and $755 in 1953. In 1952 $1,000 of this was repaid.

Donald M. Best, one of the sons of Frank E. Best, worked for Vigilance, Inc., in 1951 at a salary, soliciting memberships in the organization and setting up county organizations.

During the fiscal year ended June 30, 1953, the Foundation paid $1,008.69 to cover expenses of Best and his family in attending a political convention in Chicago. During the same fiscal year the Foundation paid expenses of $6,301.49 for printing various personal writings of Best. Subsequently Best repaid these amounts to the Foundation.

Best was interested in hydroponics, or the soilless culture of plants. He caused the Foundation to purchase land and erect buildings and pay expenses for constructing and operating a hydroponicum.

The books and records of the Foundation show the following receipts and disbursements for the fiscal years ended June 30, in 1950 to 1954, inclusive:

| | 1950 | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|---|
| *Receipts* | | | | | |
| Sale of notes | $71,908.83 | | | | |
| Royalties | 54,000.00 | $54,000.00 | $54,000.00 | $54,000.00 | $54,000.00 |
| Interest | 243.84 | 1,350.68 | 2,722.23 | 2,415.72 | 3,197.52 |
| Best Universal Lock Co | | 42,727.16 | 35,493.40 | 17,505.05 | |
| Frank E. Best | | | 20.00 | | 2,051.76 |
| Other sources | 1,201.19 | 670.72 | 1,370.19 | 11,352.48 | 6,615.75 |
| Total | 127,353.86 | 98,748.56 | 93,605.82 | 85,273.25 | 65,865.03 |
| *Disbursements* | | | | | |
| Payments on notes | | 6,446.94 | 6,748.44 | 8,250.41 | 8,323.61 |
| Interest | 6,044.23 | 8,459.20 | 7,992.38 | 7,590.23 | 7,028.22 |
| Advances—loans or purchases of stock: | | | | | |
| Best Universal Lock Co | 90,590.97 | | | 36,363.10 | 26,674.09 |
| Patrick Research | | 47,832.30 | 5,250.00 | 1,660.00 | |
| Best Aircraft Corp | | 5,000.00 | 5,007.15 | | |
| Fixed assets | 5,107.27 | 676.10 | | 916.38 | 386.78 |
| Hydroponicum | | | | | 17,782.31 |
| Expenses of Vigilance, Inc | | 17,389.10 | 52,610.05 | 14,507.05 | |
| Expenses of F. E. Best | | | | 7,310.18 | |
| Operating expenses | 23,152.46 | 11,775.39 | 14,978.34 | 7,759.39 | 5,670.02 |
| Other disbursements | 2,458.93 | 1,169.53 | 1,019.46 | 916.51 | |
| Total | 127,353.86 | 98,748.56 | 93,605.82 | 85,273.25 | 65,865.03 |

The foregoing disbursements include $10,007.15 used to purchase stock of Best Aircraft Corporation. These amounts were repaid by Best. The amounts shown as advanced to Patrick Research include personal loans to the organizers and purchases of stock in their corporation. Of the amounts loaned to the organizers $1,000 was repaid in the taxable years. The amounts advanced for expenses of Best were repaid.

The amount realized by the sale of notes in the fiscal year ended in 1950 is computed as follows:

| | |
|---|---:|
| Face value of notes issued | $154,560.00 |
| Payments made in current year | 6,020.90 |
| | |
| Net | 148,539.10 |
| Discount | 76,630.27 |
| | |
| Net amount received | 71,908.83 |

The amount shown as discount includes $38,250.27 which was turned over as contributions to the religious organizations named above. The actual discount was $38,380.

During the years 1951 to 1953, inclusive, Vigilance, Inc., received and disbursed the following amounts:

| | 1951 | 1952 | 1953 |
|---|---:|---:|---:|
| Sources of receipts: | | | |
| The Best Foundation, Inc. | $32,600.00 | $40,701.00 | $755.00 |
| Miscellaneous receipts | 458.78 | 25.00 | |
| Boyd Childs—Refund travel | 450.00 | | |
| Total receipts | 33,508.78 | 40,726.00 | 755.00 |
| Disbursements: | | | |
| Petty cash fund | 100.00 | | |
| Furniture | 383.90 | | |
| Wages and salaries | 15,878.76 | 22,473.42 | 246.25 |
| Taxes—Social Security | 122.93 | 509.77 | 12.12 |
| Taxes—Withholding | 638.60 | 2,909.00 | |
| Taxes—Unemployment | | 498.12 | 423.90 |
| Stationery and printing | 2,691.07 | 223.54 | |
| Service | 224.97 | | |
| Miscellaneous expense | 1,515.12 | 1,062.61 | 117.86 |
| Postage | 56.27 | 56.27 | |
| Bank charges | | | 4.53 |
| Office supplies | 86.40 | | |
| Travel expense | 11,475.89 | 10,962.78 | |
| Telephone | 6.33 | | |
| Incorporation and qual. | 297.72 | 760.00 | |
| Federal income tax | | 31.57 | |
| Interest on income tax | | .81 | |
| Membership fees | 21.00 | | |
| The Best Foundation, Inc. | | 1,000.00 | |
| Total disbursements | 33,498.96 | 40,487.89 | 804.66 |

Vigilance, Inc., currently has a bank account of about $500.

Vigilance, Inc., issued a pamphlet explaining its purpose as "a national organization of liberty-loving, God-honoring patriots." The organization became qualified to operate in nearly all of the United States, but did not attract many persons willing to pay the $14 membership fee asked. It ceased operating in 1953.

In 1953 Best made a donation of $2,051.76 to the Foundation with the condition that if the Foundation was not exempt under section 101(6) from income tax, the amount was to be turned over to some tax-exempt organization designated by Best.

The minutes of a special meeting of the board of directors of the Foundation on September 21, 1950, at which Best and Henry L. Pritchett, constituting a quorum of the board, were present, state:

Mr. Best recounted that the corporation is the owner of a promissory note with a face value of $15,000 bearing interest at the rate of six percent (6%),

made by Earnest H. Patrick and Betty J. Patrick on January 19, 1950, which note was made payable to the Best Universal Lock Co., Inc. and later sold by that corporation to The Best Foundation, Inc. Mr. Best further stated that, although this promissory note is owned by the Foundation, it is now in the possession of Paul E. Blackwell of 1003 Security Trust Building, Indianapolis, Indiana.

Mr. Best thereupon stated that Patrick Research and Development Laboratories has been adjudged bankrupt, and is now in process of liquidation, and that an amended plan of arrangement is about to be presented to the Referee in Bankruptcy, under which plan of arrangement, if accepted, the said laboratories will be incorporated under the Indiana General Corporation Act.

He further stated that, subsequent to the Bankruptcy of Patrick Research and Development Laboratories and, on the fourteenth day of September, 1950, the Foundation accepted a promissory note in the amount of one thousand dollars ($1,000.00) signed by Betty J. Patrick and due six months from date of acceptance at six percent (6%) interest.

Mr. Best thereupon made a motion that The Best Foundation, Inc.:

1. Assist the bankrupt and any corporation formed by said bankrupt, in every way it can, including the loaning of money, the guarantying and/or purchasing of accounts and the rendering of services and aid of any kind and nature which in the discretion of the President may seem advisable;

2. Take notes of or stock in said corporation in an amount equivalent to monies owing to the Foundation by Earnest H. Patrick and/or Betty J. Patrick in lieu of such indebtedness;

3. Subscribe to and purchase stock, the amount of such subscription to be discretionary with the President, but in no case in excess of fifty thousand dollars ($50,000).

The motion was seconded, and unanimously carried.

On November 26, 1952, Best and the Foundation agreed to a modification of the 1949 licenses changing the conditional grant to an irrevocable one and canceling paragraphs II and IV of the collateral agreement quoted above.

The Foundation paid all installments on its class A notes becoming due in the taxable years.

The Best Foundation, Inc., was not operated exclusively for religious, charitable, scientific, or educational purposes in any of the fiscal years ended in 1950, 1951, 1952, 1953, or 1954.

Best Lock Corporation's books were kept and its income tax returns made on an accrual basis of accounting.

The patents involved herein were Best's ideas and were applied for and issued in his name.

Best received patent No. 2440,434, dated April 27, 1948, a basic patent involving a multiplicity of cores that would complement a certain housing.

Some 3,600 persons other than Best held stock in Frank E. Best, Inc., and over 1,300 others held stock in Best Lock Corporation.

Best Lock Corporation's sales and net income reported on its returns in the taxable years were:

| Year | Gross sales | Net income |
|------|-------------|------------|
| 1949 | $637,052.79 | $30,819.06 |
| 1950 | 765,794.19 | 46,594.45 |
| 1951 | 1,070,216.68 | 110,913.55 |
| 1952 | 1,005,337.59 | 52,820.43 |

Best Lock Corporation's income tax return for 1949 showed as of January 1, assets of $1,257,459.02, listing plant and machinery at $526,920.17 less reserve for depletion of $458,051.13, and patents and licenses valued at $719,115.25, less reserve for depletion of $109,967.24. Liabilities listed amount to $225,463.65, capital stock $1,406,911.18, and deficit in earned surplus, $374,915.81.

No formal dividends were declared at any time by Best Lock Corporation, Best Universal Lock Company (Washington), or Frank E. Best, Inc.

Best Lock Corporation specializes in providing a locking system for a plant, school, or institution requiring many locks and master key controls. The system made use of the interchangeable lock core. During the taxable years the production of lock cores remained fairly constant and all lock cores produced were sold. During and immediately prior to the taxable years the tendency of architects and engineers has been increasingly to prescribe key-in-the-knob locks for new construction. Best had designed a lock prior to 1930 which had the keyhole in a door knob. This was known as a "unit lock." This was not as practical as the key-in-the-knob locks made by some other manufacturers and Best Lock Corporation lost a number of possible contracts because it could not meet this competition. Best attempted to devise a new and improved key-in-the-knob lock which would be superior to those made by competitors. He first made application for a patent on such a lock in 1955 but did not complete a model to his own satisfaction until 1956. This lock was not in contemplation until after 1930. It was not an improvement or addition developed or made prior to October 15, 1930, to the patents or inventions previously assigned to Frank E. Best, Inc.

The 1949 licenses conveyed the right to the use of certain issued patents and patent applications as well as patents to mature from these or other related inventions. The right to the use of these would have the effect of protecting the Corporation's locking system from invasion as the earlier patents expired. The licenses were of value to the Corporation in meeting competition of other lock manufacturers. The royalties called for by the 1949 licenses were reasonable.

Pursuant to License 7–7–49, or the substituted license of December 1949, Best Lock Corporation paid $3,000 to Best and $27,000 to the

Foundation in 1949 and $6,000 to Best and $54,000 to the Foundation in each of the years 1950, 1951, and 1952.

Best Lock Corporation recorded as catalog expenses the amounts of $27,864.75 in 1951 and $20,173.99 in 1952 in connection with a catalog copyrighted by Best Universal Lock Co., Inc., and published in 1953. Best Universal Lock Co. (Washington) published one catalog in 1924 and another in 1925. Later it published another identified as Catalog Number Ten. A catalog printed generally from the same plates was later issued by Best Universal Lock Co., Inc. (Indiana). The 1953 catalog was new. In 1956 a revision of this catalog in looseleaf form was made, largely from the 1953 plates. No price lists were contained in the 1953 or 1956 catalogs. The catalog published in 1953 was not in use in 1951 or 1952 and had a useful life beyond the year of publication. The amounts expended in 1951 and 1952 by Best Lock Corporation for preparation of this catalog were not ordinary and necessary expenses of carrying on its business in the taxable years.

Pursuant to the 1949 licenses Best received $3,000 in 1949 and $6,000 in each of the years 1950, 1951, 1952, and 1953, and the Foundation received $27,000 in 1949, and $54,000 in each of the years 1950, 1951, 1952, and 1953 from Best Lock Corporation.

OPINION.

*Royalties.*

Best Lock Corporation claimed deductions as ordinary and necessary business expenses of the amounts paid to Best and the Foundation called for by the 1949 licenses and collateral agreements relating to the key-in-the-knob lock. The respondent disallowed these deductions and this is assigned as error.

In *Thomas Flexible Coupling Co.* v. *Commissioner*, 158 F. 2d 828 (C.A. 3, 1946), certiorari denied 329 U.S. 810, affirming a Memorandum Opinion of this Court, it was held that where an inventor, for consideration in stock and royalties, had assigned patents to a corporation and agreed to assign to it all future improvements and some years later patents on improvements were issued to the inventor and assigned to the corporation for cash and additional royalties, the additional royalties were voluntary payments without consideration and were not deductible as ordinary and necessary business expenses of the corporation.

In the present case when Best organized the first of the corporations here involved, the one now known as Frank E. Best, Inc., he assigned to it his first patents in exchange for the corporation's stock. This corporation later granted a license to Best Universal Lock Co. (Washington) and in 1928 a new license identified as License #4

to the petitioner corporation now named Best Lock Corporation. In this license it is stated:

This license #4 includes rights under all United States patents and patent applications *now or hereafter owned or controlled by Frank E. Best, Inc., and amendments, additions to, or improvements upon said patents and patent applications;* provided the above mentioned patents, patent applications, amendments, additions and improvements relate and pertain to the locking contrivances, service devices and manufacturing machinery incident to the manufacture, use, exploitation and sale of the Best Universal Locking System in the United States of America. [Emphasis supplied.]

In the prior opinion in these proceedings we held that, in the absence of a showing that Best had not authorized Frank E. Best, Inc., to license the use of improvements or additions to the patents originally transferred, the inventions embodied in the key-in-the-knob lock were available to Best Lock Corporation under the license #4 from Frank E. Best, Inc., to the Corporation without payment of the additional royalties provided in the 1949 licenses, following *Thomas Flexible Coupling Co.* v. *Commissioner, supra,* and that such royalties were not required payments but were voluntary payments without consideration and were not ordinary and necessary business expenses deductible by Best Lock Corporation in the taxable years.

The additional evidence made available on rehearing shows that the license granted by Best to Frank E. Best, Inc., in 1920 conveyed the right to make, use, and sell, or license the making, use, or sale of products under Best's inventions, including *additions or improvements invented or designed within 10 years* from the date of the original license, that is, prior to October 15, 1930. Best's key-in-the-knob lock was not invented or designed within that period and it was not in contemplation until long after 1930. It follows that in 1949 Frank E. Best, Inc., did not have the right to make or license the making of Best's key-in-the-knob lock, and had no right of ownership in the patents or applications for patents which were the subject of the 1949 licenses and collateral agreements. Accordingly, the principle involved in the *Thomas Flexible Coupling Co.* case is not applicable here.

The respondent contends that, nevertheless, the right to make the key-in-the-knob lock was acquired in earlier licenses signed by Best. This contention ignores the fact that in such licenses Best signed as an officer of one of the corporations and not as an individual. Best specified what was transferred or licensed to each corporation and Frank E. Best, Inc., could license only what it had been authorized to license. It did not have the right to the inventions described in the 1949 licenses because they were not devised prior to October 15, 1930, and the right was never conveyed to it. Another contention is that the new inventions were developed by Best as an employee of

the Corporation in the Corporation's laboratory and the Corporation thereby acquired "shop rights" in the inventions. The evidence, however, shows that there was no agreement between Best and any of the corporations to the effect that he was employed to develop patents for the corporations. In *United States* v. *Dubilier Condenser Corporation*, 289 U.S. 178 (1933), it was stated:

Recognition of the nature of the act of invention also defines the limitation of the so-called shop right, which shortly stated, is that where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a non-exclusive right to practice the invention.

There was no such arrangement involved here. The facts do not support the respondent's theory. See *Hans Jordan*, 27 T.C. 265.

The respondent contends further that the payments specified in the licenses were unreasonable and excessive in amount, pointing out that the key-in-the-knob lock was not completed and was not manufactured during the taxable years, and further, that the royalties paid were capital expenditures for the right to make the improved lock, and that the rights to the patents were not depreciable during the taxable years which were prior to the granting of the patents.

The evidence supports the petitioners' contention that the royalties called for in the 1949 agreements were reasonable. It is true that Best controlled both parties to the licenses and therefore the rates provided are subject to scrutiny. However, there was more involved in the licenses than the idea of a different lock.

Best Lock Corporation had lost a number of possible contracts for installing its locking system in large plants because it did not have a satisfactory key-in-the-knob lock. The tendency of architects for some years prior to 1949 had been increasingly to specify such a lock in their plans and specifications. Best had a lock with the keyhole in a doorknob, referred to as a "unit lock," which was advertised as early as 1924, but this was not efficient enough to meet the competition of other manufacturers. Long after 1930 but prior to 1949 Best conceived the idea of a vastly improved key-in-the-knob lock with push button control and worked at designing such a lock. He built several models, applied for a patent on the device in 1955, and completed a better device in 1956 which he considers superior to those of competitors. Certain new features of this facilitated installation. This device made use of several of Best's ideas, including some which were the subject of patents issued after 1930 and before 1949, some the subject of patent applications pending in 1949 and some the subject of later patent applications. With this lock the Best locking system was complete. The right to build and market this lock was a valuable right to the Corporation.

There was a further benefit to Best Lock Corporation from the exclusive sublicense received from the Foundation in 1949. Some of the patents on locking devices it was manufacturing had expired or were soon to expire. Certain of the patents or patent applications involved in the 1949 licenses were for improved versions, developed since 1930, of these devices. The license thereby extended to the Corporation protection against invasion of its field by competitors' use of the expired patents. The protection from invasion and the right to make the improved lock when it was completed were valuable rights and justified substantial royalties. As it developed the royalties paid in the years 1949 to 1952 ranged from 4.7 per cent to 7.8 per cent of sales with an average of slightly over 5 per cent for the period. We find the royalties to be reasonable. See *Herbert C. Johnson*, 30 T.C. 675; *Leonard Coplan*, 28 T.C. 1189 (1957), acq. 1958–2 C.B. 4; *Thomas Flexible Coupling Co.*, 14 T.C. 802, affd. 198 F. 2d 350 (C.A. 3, 1952); and *John T. Potter*, 27 T.C. 200 (1956).

The exclusive licenses granted in 1949 by Best to the Foundation and by the latter to Best Lock Corporation amounted to a sale or exchange of all substantial rights to the patents, patent applications, and unpatented inventions therein described. The royalty payments called for by the contracts were consideration for the transfer of these rights and were capital payments rather than ordinary and necessary business expenses of Best Lock Corporation. However, the Corporation is entitled to deductions for depreciation pursuant to section 23(1) of the Internal Revenue Code of 1939, for the recovery of this cost. In *Associated Patentees, Inc.*, 4 T.C. 979 (1945), royalty payments were made for various existing patents and future patents to be issued on patent applications then pending or which might thereafter be pending and it was held the allowance for depreciation was to be measured by the full amount of the royalties paid. That case is similar to the present case in that both involved issued patents, pending patents, and patents to be applied for in the future. Since all the royalties provided in the 1949 licenses are part of the cost to Best Lock Corporation of the property this cost is recoverable by deductions for depreciation in amounts equal to the royalties paid in each year.

## Catalog Issue.

The respondent treated the expenses paid in 1951 and 1952 by Best Lock Corporation in preparing a catalog published in 1953 as capital items and denied deduction of such amounts as business expenses for 1951 and 1952. The petitioner relies on *E. H. Sheldon & Co.* v. *Commissioner*, 214 F. 2d 655 (C.A. 6, 1954), reversing 19 T.C. 481. There the Court of Appeals took the view that payments for preparing a catalog subsequently published were similar to advertising expenses and deductible when paid even though their effect might have a useful

life of indefinite duration in the future. A similar result was reached in *Harper & McIntyre Co.* v. *United States*, 151 F. Supp. 588 (D. Iowa, 1957). In the present case the catalogs previously published by Best Lock Corporation and its predecessor were issued at irregular intervals and largely made from the same plates. The 1953 catalog was new and was used until 1956, when it was revised and the 1953 plates were used again. It has not been shown that these plates are not available for further use. The 1953 catalog had no effect on earning the income derived in 1951 and 1952 and when issued had a useful life of more than 1 year. The amounts paid in 1951 and 1952 to produce it were capital items contributing to earning income for several years in the future and not ordinary and necessary expenses of doing business in 1951 and 1952. They are not deductible. If the *Sheldon* case, *supra*, is not distinguishable on the facts, we adhere to the views expressed in our decision there, and with all due deference to the Court of Appeals for the Sixth Circuit, prefer to follow that decision here.

### Exemption Issue.

The Foundation contends that it is an organization exempt from income tax pursuant to section 101(6) of the Internal Revenue Code of 1939 as being a corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual and no substantial part of the activities of which consists of attempting to influence legislation.

This petitioner was organized under the laws of Indiana as a not for profit corporation. It has no stock, but has classes of memberships under which Frank E. Best has control of its operations. The Foundation assisted certain churches and religious organizations financially by the sale of its notes, one-half of the price of which was collected by it and one-half given to the churches or youth organizations, while the Foundation agreed to repay the full amounts to the donors with 6 per cent interest in installments over a 15-year period. Such notes were sold between July and November 1949. The Foundation issued notes on this basis in the face amount of about $78,000.

The Foundation also made advances to a corporation, Vigilance, Inc., formed by Best and his associates with the stated purpose of providing an information service to voters in the United States, and provided funds to establish and operate a laboratory for the purpose of scientific research in the soilless culture of plants. It is contended that these are religious, educational, and scientific purposes which qualify the Foundation for exemption.

The Foundation filed tax returns and at the same time filed applications for exemption as an organization exempt pursuant to section 101(6). The respondent determined that the Foundation was not

exempt in any of the taxable years. To qualify for exemption an organization must be devoted to one or more of the purposes specified in section 101(6) exclusively, and the presence of a single contrary purpose, if substantial in nature, will disqualify the organization. *Better Business Bureau* v. *United States*, 326 U.S. 279 (1945).

As the respondent points out, the Foundation was organized in such a fashion that Best held control of its activities and expenditures; it was operated to carry out projects in which Best was interested and some of its funds were expended for the benefit of Best or members of his family.

A considerable sum was loaned to Patrick Research and Development Co., or to its principal stockholders, Earnest and Betty Patrick. Best said he was aware that these people were in financial difficulties and went to their assistance. He caused Best Lock Corporation to lend money to the individuals or their corporation on a note and subsequently transferred the note to the Foundation. Only a small payment was subsequently made on the debt. Also stock of the Patrick corporation was purchased by the Foundation. The record does not reveal the connection of the borrowers with Best Lock Corporation or disclose any business purpose of the latter in making such a loan. Nor is it explained why the Foundation would take over such an obligation at par and buy stock in the corporation, except for Best's statement that he went to the assistance of these parties. The only conclusion apparent from the record is that these disbursements represent a personal favor by Best. Over $50,000 was devoted to this objective, which is approximately 15 per cent of the total expenditures of the Foundation in the taxable years. This is a substantial amount devoted to a personal purpose.

Expenditures were made for constructing a hydroponicum. Best testified that he was anxious to see progress in this as he believes he has found what causes us to grow old and that he has found how to remedy it. He desired to carry on a scientific study of the soilless culture of vegetation and set out to do this through the Foundation. Land was purchased, buildings started, and materials collected and a chemist was employed for a time. This was to carry out a personal hobby of Best.

The issuance of some of the notes by the Foundation was intended to raise money for Best Universal Lock Co., Inc., and to provide financial assistance to religious organizations. Approximately $78,000 in notes, or about half the total were issued at a 50 per cent discount to people who gave the discount to religious organizations. The other half of the notes was issued at a 50 per cent discount and no explanation is given as to the identity of the recipients of these notes or of their connection with the business of Best Lock Corporation or the Foundation. The purpose of this is not revealed. These lenders

would ultimately receive double their loans plus interest. It was assumed that the notes could later be repaid out of the royalties. This is a substantial activity and there is no showing that it is within the purposes of section 101(6).

Best also made some use of Foundation funds for family purposes. In the fiscal years ended in 1951 and 1952 money was lent to a son, Kenneth R. Best, and other funds were used to acquire stock in Best Aircraft Corporation for the benefit of a son interested in aviation. These amounts were repaid by Best to the Foundation before June 30, 1953. In the fiscal year ended in 1953 the Foundation paid $1,008.69 upon travel expenses of Best and his family in attending a political convention and $6,301.49 for printing certain of Best's writings. Subsequent to the taxable years involved Best repaid these amounts to the Foundation.

These were substantial activities and expenditures of the Foundation which were outside those specified in section 101(6). We cannot say that part of the net earnings did not inure to the benefit of Best when they were applied to his personal purposes. See *Scholarship Endowment Foundation* v. *Nicholas*, 106 F. 2d 552 (1939). Accordingly, the respondent did not err in determining that the Foundation was not exempt pursuant to that section.

## Income to Best.

The respondent contends that the payments made by Best Lock Corporation to the Best Foundation, Inc., under the 1949 licenses are constructive income to Frank E. Best. We so held in the prior opinion, basing our conclusion on the fact that Best had retained control of the Foundation and could direct the expenditure of the income from the royalties assigned to it, and citing *Helvering* v. *Horst*, 311 U.S. 112 (1940), and *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948). A factor in our so holding was the conclusion previously reached that the royalty payments amounted to distributions of earnings and profits of Best Lock Corporation and therefore were dividends to Best, as principal stockholder, through his controlling interest in the chain of corporations.

Since we have now concluded that the payments called for by the 1949 licenses were capital investments of Best Lock Corporation and not distributions of profits, the above conclusion as to the amounts received by the Foundation does not necessarily follow. Best made a gift of an exclusive license to the Foundation to permit it to derive income for its purposes by granting an exclusive sublicense to Best Lock Corporation. The Foundation became the owner of the right to receive royalties. It was entitled to this income and incurred liabilities on the credit of its prospective income. While Best was in the position of a controlling stockholder to direct the activities

and expenditures of the Foundation, that is not a sufficient basis for concluding that the Foundation was a sham and that the royalties were constructively received by Best. This corporation even though dominated by its controlling stockholder should be recognized as a taxable entity separate from that stockholder. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436 (1943). There was a valid purpose of the Foundation, even though that purpose was charitable or religious, and while in the early years of its operation there were some deviations from these purposes which persuade us that it was not entitled to tax exemption, it was not a sham to be disregarded. We now conclude that the royalties paid to the Foundation were received by it and were not constructively received by Best.

Since the exclusive license granted in 1949 by Best to the Foundation together with the exclusive sublicense authorized and granted to Best Universal Lock Co., Inc., amounted to a sale or exchange of all substantial rights to the patents and unpatented inventions described therein, the payments to Best pursuant to such licenses are to be treated as proceeds of the sale of a capital asset held for more than 6 months. Sec. 117(q), I.R.C. 1939,[2] as amended; *Edward C. Myers*, 6 T.C. 258 (1946); *F. H. Philbrick*, 27 T.C. 346 (1956).

### *Income to Foundation.*

The payments to the Foundation under the exclusive sublicense of 1949 were likewise amounts received for the transfer of all substantial

---

[2] Sec. 117(q) provides:

(q) TRANSFER OF PATENT RIGHTS.—

(1) GENERAL RULE.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

    (A) payable periodically over a period generally coterminous with the transferee's use of the patent, or

    (B) contingent on the productivity, use, or disposition of the property transferred.

    (2) "HOLDER" DEFINED.—For purposes of this subsection, the term "holder" means—

    (A) any individual whose efforts created such property, or

    (B) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither—

    \*       \*       \*       \*       \*       \*       \*

    (ii) related to such creator, (within the meaning of paragraph (3)).

(3) EXCEPTIONS.—This subsection shall not apply to any transfer described in paragraph (1)—

    \*       \*       \*       \*       \*       \*       \*

For purposes of this paragraph, the term "related person" means a person, other than a brother or sister (whether of the whole or half blood), with respect to whom a loss resulting from the transfer would be disallowed under section 24(b).

(4) APPLICABILITY.—This subsection shall apply with respect to any amount received, or payment made, pursuant to a transfer described in paragraph (1) in any taxable year beginning after May 31, 1950, regardless of the taxable year in which such transfer occurred.

rights to these patents or patent applications. The Foundation, however, was not a "holder" of the property within the definitions of section 117(q) cited above, and that section is not applicable here. The treatment of these payments to the Foundation therefore depends upon other principles of law than these sections, *Leonard Coplan*, *supra; Robert L. Holcomb*, 30 T.C. 354. In accordance with the principles applied in the *Coplan* and *Holcomb* cases we conclude that the amounts received by the Foundation from Best Lock Corporation are likewise to be treated as long-term capital gains.

In the prior opinion we concluded that Best Foundation, Inc., had no net taxable income in the fiscal years involved. This followed from the holding that the royalties paid the Foundation were taxable as dividends to Frank E. Best. Since we now conclude that these royalties were income to the Foundation, it becomes necessary to decide issues raised as to deductions from income and as to borrowed invested capital.

The Foundation alleges error in the denial of deductions for money it advanced, loaned, or contributed to Vigilance, Inc., as ordinary and necessary business expenses, or as business bad debts which were worthless when made, or as contributions. It contends that these amounts were paid to further the educational purposes of the Foundation.

These amounts are not deductible as business expenses. Payment of the expenses or obligations of another is not an ordinary business expense. *Welch* v. *Helvering*, 290 U.S. 111 (1933); *A. Giurlani & Bro.*, 41 B.T.A. 403 (1940), affd. 119 F. 2d 852 (C.A. 9, 1941). Nor is there evidence of any intent to create a debt. If the payments were gifts it has not been established that Vigilance, Inc., is an organization of a character such that gifts to it are deductible under section 23(q) of the Internal Revenue Code of 1939.

The respondent determined that $76,630.27, representing the discount on the 15-year notes issued by the Foundation in 1949 should be amortized over the 15-year period and not deducted in full in the year of issue. The Foundation contends that the amount to be so amortized is $38,380 only, since $38,250.27 was contributed to various religious organizations. The books show that notes were issued in the face amount of $154,560 and net cash received therefrom was $71,908.83, after deduction of $38,380 in discounts and $37,250.27 in contributions through the notes as direct or indirect contributions to religious organizations. The evidence indicates that the correct amount of discounts was $38,380, which the Foundation agrees should be amortized. The amounts paid over directly or indirectly to the religious organizations should be treated as contributions by the Foundation to such organizations as may be qualified and deductible

as contributions in the fiscal year subject to the applicable limitations upon such deductions. See sec. 23(q), I.R.C. 1939.

The Foundation also contends that the respondent erred in determining that the deficiencies should be increased by a recomputation of excess profits net income including an adjustment for interest on borrowed capital under section 433(a)(1)(N) in each of the fiscal years ended in 1952, 1953, and 1954, saying that if an adjustment is required, it should be computed under section 433(a)(1) (N) or (O), whichever gives the lesser adjustment.

The Foundation's corporation income tax returns showed net losses for each of these years and no income or excess profits taxes due. In the deficiency notice the respondent determined the normal-tax net income, added 75 per cent of the interest on borrowed capital to determine the excess profits net income, deducted $25,000 as the excess profits credit, to determine the adjusted excess profits net income, and computed the excess profits tax from the resulting figures.

Under section 431, I.R.C. 1939, the adjusted excess profits net income is to be determined by deducting from excess profits net income as defined in section 433(a) [3] the credit allowed under section 434 and the unused excess profits credit adjustment in accordance with section 432, with a minimum deduction of $25,000.

Section 434 provides for a credit based upon income, to be computed under section 435, or a credit based upon invested capital, to be computed under section 436, whichever method results in the lesser excess profits tax.

The Foundation contends that the excess profits net income was not determined under either section 436 or section 435 and therefore no such adjustment for interest is authorized. We have held otherwise. *Midland Bean Co.*, 25 T.C. 1142 (1956). The statute contemplates an adjustment under section 433(a)(1) (N) or (O), whichever method

---

[3] Sec. 433(a) provides, in part:

(a) TAXABLE YEARS ENDING AFTER JUNE 30, 1950.—The excess profits net income for any taxable year ending after June 30, 1950, shall be the normal-tax net income, as defined in section 13(a)(2), for such year increased or decreased by the following adjustments:

(1) ADJUSTMENTS.—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(N) Interest—Credit Based Upon Invested Capital.—*If the excess profits credit for the taxable year is computed under section 436* the deduction for interest shall be reduced by an amount equal to 75 per centum of so much of such interest as represents interest on the indebtedness included in the daily amounts of borrowed capital (determined under section 439(b)). [Emphasis supplied.]

(O) Interest—Credit Based Upon Income.—*If the excess profits credit for the taxable year is computed under section 435,* the deduction for interest shall be reduced by an amount which bears the same ratio to the interest on the indebtedness included in the daily amounts of borrowed capital (determined under section 439(b)) as the excess of the amount determined under section 435(g)(3)(C) over the aggregate, divided by the number of days in the taxable year, of the amount determined under section 435(g)(4)(E) for each day of the taxable year, bears to the average borrowed capital for the taxable year (as defined in section 439(a)). [Emphasis supplied.]

results in the lesser tax. This adjustment may be resolved under Rule 50.

### Contribution by Best.

Since the Foundation is not exempt under section 101(6), Best is not entitled to deduct in 1953 the conditional contribution made to it in that year.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*