DUMAINE FARMS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13428–78X.     Filed January 9, 1980.

*Frederick D. Herberich, Katharine Sanderson Heidlage,* and *Philip J. Sweeney III,* for the petitioner.
*Bernard B. Kornmehl,* for the respondent.

## OPINION

FAY, *Judge:* Respondent determined petitioner does not qualify for exemption from Federal income tax under section 501(a)[1] as an organization described in section 501(c)(3). Having exhausted its administrative remedies as required by section 7428(b)(2), petitioner has timely challenged respondent's determination and invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428(a). The issues are whether petitioner is organized and operated exclusively for scientific, educational, or charitable purposes, and whether petitioner is operated for private benefit.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

This case was submitted for decision on the stipulated administrative record under Rules 122 and 217, Tax Court Rules of Practice and Procedure. The evidentiary facts and representations contained in the administrative record are assumed to be true for purposes of this proceeding.[2] The relevant facts are summarized below.

At the time its petition was filed in this case, petitioner's principal office was located in Boston, Mass.

Petitioner is an irrevocable trust known as Dumaine Farms, established by Frederic C. Dumaine (F. Dumaine) in Boston, Mass., on December 1, 1977. Petitioner's only substantial asset is 75 acres of land situated in Rockingham County, N.C., conveyed to petitioner on December 30, 1977, by F. Dumaine, the trust settlor, and his wife, Margaret.

Petitioner's governing instrument describes its objectives and purposes as follows:

> The purpose of this trust shall be to hold the property initially given and any other real and personal property received by gift, devise, bequest, purchase or otherwise, and to maintain, improve, operate and manage the same as an experimental and demonstration farm for the benefit of the general public and particularly the farmers and other people of Rockingham County, North Carolina. The purpose of the farm shall be to improve the quality of farming by the selection and types of crops grown, the management and restructuring of the land, the planting and harvesting of trees, the selective preservation of native growth in such manner as to demonstrate that farming can be profitable while maintaining sound, ecological principles and native wildlife. In furtherance of its charitable purposes, the trust may acquire as part of the trust property additional land and other property, erect or otherwise construct, maintain and utilize any one or more buildings or other structures or abandon the same, plant, cultivate and harvest agricultural products, purchase machinery and hire experts and other personnel in furtherance of its purposes. It shall not be the purpose of this trust to make money except as incidental to showing that an ecologically sound farm may be profitable.

As restated in petitioner's initial application for recognition of exempt status: "The purpose of the trust is to dedicate to public use land and facilities in Rockingham County in order to experiment in and disseminate knowledge about improved methods of agriculture and particularly to demonstrate that profitable farming can be combined with wildlife management

---

[2]*Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488, 499 (1977); Rule 217(b)(1), Tax Court Rules of Practice and Procedure. See Note, Rule 217(a), Amendments to Rules of Practice and Procedure, 68 T.C. 1025, 1048 (1977).

and conservation of natural areas." In short, petitioner is organized as an experimental demonstration farm. Its purpose is to demonstrate to local farmers and the general public the economic feasibility of experimental farming practices which will conserve the area's ecology and native wildlife.

Petitioner's trust articles go on to provide: "This trust is created and shall be operated exclusively for charitable, scientific or educational purposes within the meaning of those terms as used in section 501(c)(3)." In addition, the articles prohibit political activity, self-dealing, noncharitable investments, and the use of trust assets for the private benefit of any individual. Although petitioner is intended to be perpetual, its articles provide that in the event of termination, the trustees shall distribute petitioner's assets to organizations described in sections 501(c), 170(c), and 2522.

Petitioner presently has three trustees: Dudley B. Dumaine (D. Dumaine), Albert B. Hunt, and Rufus R. Beaver. Under the terms of its governing instrument, petitioner may not have less than 3, nor more than 12, trustees, who act by majority in all matters. On petitioner's Application for Recognition of Exemption Under Section 501(c)(3), petitioner indicated that F. Dumaine, the settlor, is chief executive officer and a director of Amoskeag Co., and that D. Dumaine, trustee, is F. Dumaine's son and Amoskeag's president and chief operating officer. Albert Hunt is chairman of the board of Amoskeag and is experienced in philanthropic endeavors. Rufus Beaver, a Native North Carolinian with an extensive background in farming, holds a bachelor of science degree in agricultural education and is a former teacher of vocational agriculture.

Respondent's request for additional information to supplement petitioner's application contained the following question:

9. Describe in detail your relationship to the Amoskeag Company and the character and nature of their business activities.

Petitioner replied:

9. The Amoskeag Company has no legal or other relationship to Dumaine Farms.

This matter was not pursued further during the administrative process.

In December 1977, when petitioner first applied for recognition of exempt status, it had engaged in no operations. Petition-

er was still not fully operational by the date of its final submission into the administrative record in July 1978. Thus, our descriptions are based partly on actual operations and partly on proposed operations.

Viewed broadly, petitioner is a model farm operated as a conservation project. Both its experimental projects and its demonstration function further its overriding purpose of conserving the ecology.

However, petitioner does not intend merely to preserve land in an untouched natural state. Rather, petitioner's goal is to test and demonstrate the restoration of overcultivated, exhausted land to a working ecological balance. For this reason, it is essential to petitioner's purpose that its land is generally representative of the surrounding farmland in the county. Petitioner readily admits its land does not have special environmental attributes, nor is the land part of an ecologically significant undeveloped area such as a swamp, marsh, forest, or other wilderness tract.

Petitioner encourages more local practice of the farming and conservation techniques it is developing. However, farmers dependent upon the land for their livelihood cannot be expected to adopt unproven methods. Thus, one of petitioner's goals is to demonstrate the economic feasibility of farming techniques which conserve and protect the environment. Produce and timber grown on petitioner's land will be sold in the usual farm markets, and the proceeds will be used to cover operating costs. Petitioner will also use crop proceeds to pay for making the results of its experimental projects available to the public. Extensive fundraising is not contemplated, but, if needed, contributions will be sought from those most interested in petitioner's agricultural and conservation programs.

Petitioner's estimated budget for 1978 shows a net farm profit of $2,920, based on receipts of $5,000 and crop expenses of $2,080. These estimated expenses were somewhat lower than they might have been otherwise, since the use of machinery was to be provided without charge by F. Dumaine, the grantor, in conjunction with his other farming activities. Petitioner also estimated it would spend $1,200 on advertising, posting signs,

and other costs of reaching the public, leaving $1,720 as 1978 net receipts.[3] Because in its first year petitioner was not fully operational, the 1978 figures do not reflect the full range of petitioner's proposed activities and do not include such items as timber income, nominal access fees, drainage and irrigation expenses, monitoring and information distribution costs, or machinery and depreciation.

Petitioner's experimental farming methods continue, to a large extent, work begun by the settlor F. Dumaine on his private farmlands. F. Dumaine owns approximately 1,600 acres of land in Rockingham County, of which 600 acres are farmed. Some of the farmland has been used to conduct experiments in farming methods and new crops particularly suited to the Rockingham County area of North Carolina. Those parts of F. Dumaine's land not farmed have been actively managed as both conservation lands and wildlife preserves. The 75 acres deeded to petitioner comprise the eastern portion of a 425-acre tract known as the Ormond Plantation, and the conservation work done on petitioner's land is representative of that carried on over the entire tract. In contrast to petitioner's land, F. Dumaine maintains a residence on his private property and leases out some of his land to tenant farmers who grow tobacco.

Petitioner plans work closely with various public agencies and academic institutions in developing plans for additional research. As of the close of the administrative record, trustee Rufus Beaver had held discussions with a number of such agencies, but no formal arrangements had been completed. Some of these agencies have already participated in the development of projects on the trust property. The trustees believe that to make optimum use of trust resources and to avoid duplication of efforts, petitioner should operate as a demonstration project for public agencies already engaged in the fields of agriculture, conservation, forestry, and wildlife management.

---

[3] Petitioner originally applied for recognition of exempt status as a private foundation under secs. 501(c)(3) and 509. However, on the basis of its estimated budget for 1978, petitioner amended its application to indicate that it sought exemption as a nonprivate foundation under the broad public support test of sec. 509(a)(2).

In its amended application, petitioner stated more than one-third of its support would come from admissions or sales of agricultural products, that such activities did not constitute "an unrelated trade or business," citing sec. 1.513–1(d)(4)(ii), Income Tax Regs., and that the other requirements of sec. 509(a)(2) were satisfied. Petitioner's status as a nonprivate foundation was not challenged in respondent's determination letter.

Much of the land in petitioner's area of North Carolina has been exhausted by repetitive cash-crop farming, and some of petitioner's efforts are directed toward showing how the land may be returned to its most useful productive state. In particular, petitioner seeks to demonstrate that the least arable portions of the land in this area should not be cultivated for crops, but should be planted with trees, shrubs, and grasses. Such plantings help improve the land's ability to store water and prevent soil erosion. Loblolly pines have been planted to provide forest cover and a potential timber crop. Various experimental tree plantings have been started and will be continued to determine the best species for timber production and watershed and wildlife protection. Some land has been partially cleared and planted with shrubs and grasses such as lespedeza and fescue to check soil erosion. Lespedeza, a bush clover, is also grown to provide cover and as a forage crop for wildlife.

Representatives of the Soil Conservation Service of the United States Department of Agriculture, who have worked with F. Dumaine in the past, have proposed conducting a detailed soil survey of petitioner's entire property, from which a unified resource conservation plan could be developed and implemented. The North Carolina Department of Natural Resources & Community Development has also expressed interest in demonstrating modern forest management and conservation techniques on petitioner's land.

Moreover, by proper attention to its nontillable land, petitioner will also be providing feeding, watering, and breeding areas for game fowl, deer, and other wildlife. Petitioner intends to demonstrate that game may be used as a reliable supplemental food source if properly managed. Hunting and fishing by the general public will be carefully controlled to monitor the results of petitioner's wildlife management programs. Initially, no hunting of deer or wild turkey will be permitted so that their populations may increase.

Petitioner has discussed participation in the RENEW (Renewed Emphasis Now on an Environment for Wildlife) program of the North Carolina Wildlife Resources Commission. Under the program, landowners open their land to licensed hunters from the local public in return for assistance in developing an optimum wildlife habitat and supervision by commission enforcement officers. The RENEW program parallels and incorpo-

rates many aspects of the wildlife conservation work already practiced on petitioner's land.

Petitioner's agricultural program seeks to demonstrate the commercial viability of ecologically sound farming techniques not yet practiced in the surrounding community. Thus, petitioner will not conduct purely theoretical research, but will use information drawn from the existing literature and supplied by local academic institutions. As a model farm, petitioner will complement such research with experiments on a sufficient scale to demonstrate their economic feasibility to local farmers.

Petitioner will not use its farmlands to raise established cash crops, but will plant and harvest on a commercial scale what are thought to be promising new strains. Horace Hux of the Agricultural Extension Service of North Carolina State University indicated that scientific analysis of new crop strains being tried at his facility usually destroyed most of the product and that, without a working farm such as petitioner's, commercial data had to be based entirely on projections. In 1978, petitioner cultivated 42 of its 75 acres on which were planted soybeans (40 acres), clover, and lespedeza hay.

The soil management methods petitioner practices include contour and deep plowing and limiting the raising of crops to the most usable land, reserving the rest for conservation purposes and to improve the watershed. Petitioner plans to conduct further experiments in tilling involving subsoiling, minimum tillage, crop rotation, and proper fertilizing and irrigation techniques. As part of maintaining the conservation lands, F. Dumaine has built, and petitioner will continue to construct, ponds and irrigation systems both for wildlife and as a reserve water supply.

Before petitioner was created, the grantor, F. Dumaine, had discussed his farming and wildlife experiments with neighborhood farmers at informal gatherings. These ad hoc meetings were felt to be particularly suited to disseminating the results of his projects within the local farming community. Petitioner, on the other hand, intends to communicate with the interested public in a more organized fashion.

Since petitioner is a demonstration project operating both a working farm and a protected wildlife habitat, it will not be continuously open to the public as would be a museum or nature trails area. Instead, the results of petitioner's research and

experimentation will be shared with the farmers in the county and the general public on specified visiting days throughout the year. Such visiting days will be publicized through local newspaper and radio announcements, as well as through the public agencies cooperating with petitioner on various projects. Personnel of such agencies will be on the property on visiting days to describe petitioner's activities. Other efforts to inform particular segments of the public at large about petitioner's work will include opening the wildlife areas to properly licensed hunters on a basis that will permit monitoring wildlife populations and use of the trust property by student groups from local elementary schools, high schools, and the community college in conjunction with agriculture and conservation courses or study units. Petitioner will try to include in its budget the preparation of descriptive booklets for visitors.

Petitioner will also be accessible at other times to the staffs and members of those public agencies cooperating with petitioner on various projects. Such personnel, along with petitioner's employees, will be available by appointment to allow local farmers or other interested parties to visit and discuss the operation and results of petitioner's agriculture, wildlife, and conservation projects. To some extent, petitioner will rely on the public agencies working in conjunction with particular projects to reach interested parties about the research carried out on petitioner's land.

Section 501(a) exempts from income tax, organizations, among others, described in section 501(c)(3).[4] An organization will qualify under section 501(c)(3) only if (1) it is organized and operated exclusively for one or more listed exempt purposes, (2) no part of its net earnings inures to the benefit of any private

---

[4]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

\* \* \* \* \* \* \*

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\* \* \* \* \* \* \*

(3) Corporations, and any community chest, fund, or foundation organized and operated exclusively for \* \* \* charitable, scientific, \* \* \* or educational purposes, \* \* \* no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, \* \* \* and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

shareholder or individual, and (3) it devotes no substantial part of its activities to political or lobbying activity. *Peoples Translation Service v. Commissioner*, 72 T.C. 42, 46 (1979); *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488, 491 (1977). Accord, art. 101(6)–1, Regs. 86 (1934). Respondent asserts petitioner does not satisfy the first two of these requirements.

In September 1978, respondent issued a final determination letter denying petitioner exempt status under section 501(c)(3). In the letter, respondent stated the adverse ruling was based on the following two reasons:

> You have not established that you are operated exclusively for any exempt purpose enumerated in section 501(c)(3) of the Code. Also, you have not established that you are operated for public rather than private interests.

In addition, in his answer to the petition, respondent alleged petitioner was not organized exclusively for exempt purposes within the meaning of section 501(c)(3). This issue had not been previously raised at any time during the administrative process.

The central issue in this case is the troublesome and frequently litigated question whether an organization of a type ordinarily taxed as a commercial enterprise may be exempt from taxation because its purposes are charitable, scientific, or educational.[5] Simply put, we are asked to decide whether petitioner is merely a commercial farm or, in fact, serves valid exempt purposes. See *Trinidad v. Sagrada Orden de Predicadores*, 263 U.S. 578 (1924).

More specifically, the issues in this case are (1) whether respondent may properly challenge the sufficiency of petitioner's organizational document having not raised the issue in his determination letter and, if so, (2) whether petitioner is organized exclusively for exempt purposes; (3) whether petitioner has demonstrated it is operated exclusively for scientific, educational, or charitable purposes; and (4) whether petitioner is operated for private benefit. We will consider issues (1) and (2) together in relation to the organizational test.

---

[5] See, e.g., *Industrial Aid for the Blind v. Commissioner*, 73 T.C. 96 (1979); *Federation Pharmacy Services, Inc. v. Commissioner*, 72 T.C. 687 (1979); *Peoples Translation Service v. Commissioner*, 72 T.C. 42 (1979); *est of Hawaii v. Commissioner*, 71 T.C. 1067 (1979). For an excellent discussion of this problem and a review of the case law in the religious publishing field, see *Pulpit Resource v. Commissioner*, 70 T.C. 594, 604–609 (1978).

## Organizational Test

The regulations declare that because the "organized and operated" test is stated conjunctively in the statute, each leg of the requirement must be separately satisfied. Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs.[6] See *Peoples Translation Service v. Commissioner*, 72 T.C. 42, 46 (1979); *General Conf. of the Free Church v. Commissioner*, 71 T.C. 920, 926 (1979). However, before we decide whether petitioner satisfies the organizational test, we must first resolve the threshold question whether this issue is properly before us at all.

Petitioner argues respondent may not now claim it is not organized exclusively for exempt purposes because respondent never contested this issue during the administrative process. Respondent argues he properly raised the issue in his answer to the petition. We agree with respondent.

It is true that in *Peoples Translation Service v. Commissioner, supra,* we held respondent was not permitted to raise a new argument against an application for exempt status for the first time on reply brief. See also *Goodspeed Scholarship Fund v. Commissioner,* 70 T.C. 515 (1978). In *Peoples Translation Service,* we noted that since the administrative record had closed, the applicant would have been prejudiced by its inability to counter with factual data respondent's new argument, which related to the manner of its operation.

However, we think this case is distinguishable from *Peoples Translation Service* and is controlled by our Rules 213(a)(2) and 217(c)(2)(ii), Tax Court Rules of Practice and Procedure.[7] Our

---

[6]Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs., provides:

"In order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section. If an organization fails to meet either the organizational test or the operational test, it is not exempt."

These regulations were first promulgated in 1959 and reject the widely held prior view that "organized and operated [for exempt purposes]" stated, in effect, a single test. See, e.g., *Roche's Beach, Inc. v. Commissioner,* 96 F.2d 776 (2d Cir. 1938), specifically rejecting the contrary view of *Sun-Herald Corp. v. Duggan,* 73 F.2d 298 (2d Cir. 1934); *Waller v. Commissioner,* 39 T.C. 665, 675 n. 5 (1963); sec. 39.101(6)–1, Regs. 118 (1953). See generally 69 A.L.R.2d 871, 879–892 (1960). Cf. sec. 1.501(c)(3)–1(f), Income Tax Regs.

[7]Rule 213(a), Tax Court Rules of Practice and Procedure, provides in part:

"(2) *Form and Content:* * * * In addition, the answer shall contain a clear and concise statement of every ground, together with the facts in support thereof, on which the Commissioner relies and has the burden of proof."

Rule 217(c), Tax Court Rules of Practice and Procedure, provides in part:

"Burden of Proof: The burden of proof in declaratory judgment actions shall be as follows:

rules dealing with declaratory judgments received express congressional endorsement in the legislative history to section 7428.[8] Rule 217(c)(2)(ii) implicitly permits respondent to raise issues not relied on in the determination letter, and Rule 213(a)(2) expressly permits such issues to be raised in respondent's answer. Since respondent bears the burden of proof with respect to such issues, it is he who must assume the risk that the facts in the record are insufficient to prove his point. Moreover, in this particular case, the primary evidence with respect to the organizational issue is petitioner's trust instrument. Because petitioner was required to and did submit its organizing document as part of its initial application,[9] petitioner has not been prejudiced here.

We therefore hold respondent has properly raised the issue whether petitioner satisfies the organizational test.

In reaching the substantive issue, we first note section 501(c)(3) requires an organization described therein to be *organized exclusively* for one or more exempt purposes. Therefore, the regulations demand that the organization's articles: [10]

(*a*) Limit the purposes of such organization to one or more exempt purposes; and

(*b*) Do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes. [Sec. 1.501(c)(3)–1(b)(1)(i), Income Tax Regs.]

Under the second of the above limitations, the organization may not be empowered by its articles to substantially engage in activities that do not further exempt purposes.[11] See *Santa Cruz*

---

         *        *        *        *        *        *        *

"(2)(ii) *Respondent:* The burden of proof shall be upon the respondent as to any ground upon which he relies and which is not stated in the notice of determination." * * *

[8]S. Rept. 94–938, 94th Cong., 2d Sess. (1976), 1976–3 C.B. (Vol. 3) 49, 626; H. Rept. 94–658, 94th Cong., 1st Sess. (1975), 1976–3 C.B. (Vol. 2) 695, 977–978.

[9]See *Form 1023, Application for Recognition of Exemption Under Section 501(c)(3)*, Part II (1977).

[10]Sec. 1.501(c)(3)–1(b)(2), Income Tax Regs., defines "articles" as follows:

"For purposes of this section, the term 'articles of organization' or 'articles' includes the trust instrument, the corporate charter, the articles of association, or any other written instrument by which an organization is created."

[11]Sec. 1.501(c)(3)–1(b)(iii), Income Tax Regs., expands upon this requirement and states:

"An organization is not organized exclusively for one or more exempt purposes if its articles expressly empower it to carry on, otherwise than as an insubstantial part of its activities, activities which are not in furtherance of one or more exempt purposes, even though such organization is, by the terms of such articles, created for a purpose that is no broader than the purposes specified in section 501 (c)(3).

*Building Ass'n v. United States*, 411 F. Supp. 871 (E.D. Mo. 1976). See also *Peoples Translation Service v. Commissioner*, 72 T.C. at 47–48.

Respondent first argues that petitioner's articles empower it to improve the quality of farming by its operation of a farm and that farming constitutes a substantial nonexempt purpose. Petitioner argues it is not authorized merely to operate a farm and contends respondent has read its articles too broadly and failed to consider the purposes to which petitioner must devote its farming activities. We agree with petitioner.

In challenging the sufficiency of petitioner's trust document, respondent does not dispute that petitioner's articles may reveal scientific, educational, or charitable purposes. Rather, respondent claims that in addition to any exempt purposes, petitioner is also organized to operate a farm, which constitutes a prohibited, nonexempt commercial purpose. However, we think it is plain petitioner's articles appropriately limit its purposes.[12]

Petitioner's articles provide: "The purpose of the farm shall be to improve the quality of farming by [operating] in such manner as to demonstrate that farming can be profitable *while maintaining sound, ecological principles and native wildlife.*" (Emphasis added.) These purposes are far more limited than merely to improve the quality and profitability of agriculture. Petitioner's articles expressly limit its agricultural activities to those which preserve the ecology and maintain local wildlife. In addition, the purpose of these agricultural practices is further limited by the articles' mandate to operate an experimental and demonstration farm for public benefit. Finally, the articles provide: "It shall not be the purpose of this trust to make money except as incidental to showing that an ecologically sound farm may be profitable." Thus, profitability is not a goal in and of itself since its only purpose is to demonstrate the practical value of petitioner's conservation activities. We therefore hold peti-

---

*Thus, an organization that is empowered by its articles 'to engage in a manufacturing business', or 'to engage in the operation of a social club' does not meet the organizational test regardless of the fact that its articles may state that such organization is created 'for charitable purposes within the meaning of section 501(c) (3) of the Code.'* [Emphasis added.]"

[12]We therefore need not rely on the view of the Court of Appeals for the First Circuit, to which appeal would lie in this case, that an organization's purposes may also be inferred from its manner of operations. *Elisian Guild, Inc. v. United States*, 412 F.2d 121 (1st Cir. 1969). See also *Taxation with Representation v. United States*, 585 F.2d 1219 (4th Cir. 1978); *General Conf. of the Free Church v. Commissioner*, 71 T.C. 920, 927 (1979).

tioner is not organized for the nonexempt commercial purpose of farming.

Respondent's alternative argument is that petitioner's articles fail to describe in detail petitioner's manner of operations, and that this is required by section 1.501(c)(3)–1(b)(1)(ii), Income Tax Regs., because petitioner's purposes are more specific than those enumerated in section 501(c)(3).[13] However, we rejected this approach in *General Conf. of the Free Church*, 71 T.C. at 927, and we reject it here. Respondent misreads his own regulations which clearly provide that to meet the organizational test, "the organization's purposes, as stated in its articles, may be as broad as, or more specific than, the purposes stated in section 501(c)(3)." Sec. 1.501(c)(3)–1(b)(1)(ii), Income Tax Regs. Petitioner's articles satisfy this requirement because they state: "This trust is created and shall be operated exclusively for charitable, scientific, or educational purposes within the meaning of those terms as used in Section 501(c)(3)." The regulation just cited goes on to state that a detailed description is a satisfactory *alternative* to using the words "charitable," "scientific," or "educational." Otherwise, however, additional specificity is inconsequential. See *General Conf. of the Free Church v. Commissioner, supra; Christian Stewardship Assistance v. Commissioner*, 70 T.C. 1037, 1041 n. 3 (1978).

For the above reasons, we hold petitioner is organized exclusively for exempt purposes under section 501(c)(3).

### Operational Test

The central question in this dispute is whether petitioner is operated exclusively for charitable, scientific, or educational purposes.

An organization is "operated exclusively" for exempt pur-

---

[13]Sec. 1.501(c)(3)–1(b)(1)(ii), Income Tax Regs., provides in part:

"In meeting the organizational test, the organization's purposes, as stated in its articles, may be as broad as, or more specific than, the purposes stated in section 501(c)(3). Therefore, an organization which, by the terms of its articles, is formed 'for literary and scientific purposes within the meaning of section 501(c)(3) of the Code' shall, if it otherwise meets the requirements in this paragraph, be considered to have met the organizational test. * * * *Moreover, it is sufficient if the articles set forth the purpose of the organization to be the operation of a school for adult education and describe in detail the manner of the operation of such school.* In addition, if the articles state that the organization is formed for 'charitable purposes,' such articles ordinarily shall be sufficient for purposes of the organizational test (see subparagraph (5) of this paragraph for rules relating to construction of terms). [Emphasis added.]"

poses if it is engaged primarily in activities which accomplish one or more purposes described in section 501(c)(3). Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. Since petitioner is engaged in various activities, we must determine whether each substantial activity carried on is directed towards the accomplishment of one or more exempt purposes. See *Christian Manner International v. Commissioner*, 71 T.C. 661, 667–668 (1979); *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. 202, 211 (1978). In this suit for a declaratory judgment, the burden of proof is on petitioner to show respondent erred in determining it failed to satisfy the operational test. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352 (1978); *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488 (1977); Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure.

Respondent's principal contention throughout the administrative process has been that petitioner did not provide enough information regarding its proposed activities to enable respondent to rule favorably. Thus, respondent contends on brief, "petitioner's application and supporting documents are so vague and general that they fail to establish that it is operated exclusively for any exempt purpose."[14] Petitioner maintains it has fully described its activities and demonstrated it is operated exclusively for exempt purposes. We agree with petitioner.

Respondent relies on *Church in Boston v. Commissioner*, 71 T.C. 102 (1978), and *General Conf. of the Free Church v. Commissioner*, 71 T.C. 920 (1979). Both of those cases held the taxpayer failed to satisfy the operational test for want of information. In *Church in Boston v. Commissioner, supra*, the taxpayer received contributions a substantial part of which were disbursed as grants. In response to repeated inquiries by respondent, the taxpayer failed to provide any documentation explaining what criteria were used to select recipients, how the amounts of particular grants were determined, or the purpose of the grants. In *General Conf. of the Free Church v. Commissioner, supra*, the taxpayer replied to respondent's requests for more detailed information with constitutional objections and biblical quotations. We found such answers to be sincere but ambiguous and incomplete with respect to the operational test. Thus, in

---

[14]Similarly, respondent characterizes petitioner's protest of the proposed adverse determination letter as "merely parrot[ing] the regulations * * * without describing in detail the activities and programs it has established."

both cases, we found the applicants had failed to show for what exempt purposes their activities were carried on.

The case before us is distinguishable because the purposes motivating petitioner's activities are clear. All of petitioner's activities directly further its purposes of testing and demonstrating the economic feasibility of practicing environmental conservation theories on a working farm. With the information provided in the administrative record, respondent should have been able to determine whether these purposes were exempt.

Relying on section 601.201(n)(1)(ii), Statement of Procedural Rules,[15] respondent also contends petitioner's application and supporting documents do not adequately describe its proposed activities. Section 601.201(n) (1)(ii), *supra*, provides in part:

Exempt status will be recognized in advance of operations if proposed operations can be described in sufficient detail to permit a conclusion that the organization will meet the particular requirements of the section under which exemption is claimed. A mere restatement of purposes or a statement that proposed activities will be in futherance of such purposes will not satisfy these requirements. The organization must fully describe the activities in which it expects to engage, including the standards, criteria, procedures, or other means adopted or planned for carrying out the activities; the anticipated sources of receipts; and the nature of contemplated expenditures. * * *

The position taken in these regulations is that tax exemption is based not on good intentions, but on actual charitable, scientific, or educational activities. In this case, however, we think respondent has ignored the overall picture presented by the administrative record.

To begin with, we reemphasize that our decision in this case is predicated upon the assumption the facts as represented in the administrative record are true. Rule 217(b)(1), Tax Court Rules of Practice and Procedure. This Court has repeatedly held that petitioners asking for a declaratory judgment of exempt status may not supplement or go outside of the record,[16] and a necessary corollary is that petitioners are entitled to a ruling based upon the record as submitted. See *Aid to Artisans, Inc. v. Commissioner,* 71 T.C. at 213, 216. Respondent may not simply dismiss descriptions of proposed activities as mere restatements of

[15]Accord, sec. 5.02, Rev. Proc. 72–4, 1972–1 C.B. 706, supplemented by Rev. Proc. 76–33, 1976–2 C.B. 655, and Rev. Proc. 77–21, 1977–1 C.B. 586.

[16]*est of Hawaii v. Commissioner,* 71 T.C. 1067, 1076 (1979); *Church in Boston v. Commissioner,* 71 T.C. 102, 105–106 (1978); *Houston Lawyer Referral Serv. v. Commissioner,* 69 T.C. 570 (1978).

purpose. Many statements about future activities include an element of purpose as a mode of description; for example, petitioner's statement it intends to plant different varieties of trees on its conservation lands to determine which species both maximize timber production and improve the watershed describes a goal which should not obscure the activity also described. Our findings of fact have taken petitioner's descriptions of proposed activities at their face value.

Moreover, respondent's procedural regulations require only that "proposed operations * * * be described in *sufficient detail* to permit a conclusion that the organization *will meet* the particular requirements" for exemption. (Emphasis added.) Congress reaffirmed this approach by enacting section 7428, which permits an organization to obtain a declaratory judgment based upon proposed activities before substantial time and resources have been committed towards actual operations. See sec. 7428(a)(1)(A); S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 624–626 & n. 7. See also *Bob Jones University v. Simon*, 416 U.S. 725, 749–750 (1974); *Commissioner v. "Americans United" Inc.*, 416 U.S 752, 773–781 (1974) (Judge Blackmun dissenting). Based on the entire administrative record, we think it clear petitioner sufficiently described its activities to have enabled respondent to rule favorably on its application for exempt status.[17]

We thus turn to whether petitioner has demonstrated its activities will further scientific, educational, or charitable purposes as those terms are used in section 501(c)(3).

The regulations do not define "scientific" with any greater precision than to state that "scientific research" carried on in the public interest will qualify if the purpose is "scientific."[18] The

---

[17]Respondent's other objections, that petitioner's supplemental submissions into the record merely argued the law, parroted the regulations, and were repetitive are equally unconvincing. Sec. 601.201(n)(5)(i) and (ii), Statement of Procedural Rules, requires an organization to set forth in its protest letter a complete statement of the law and arguments on which it relies. See also *Thompson v. Commissioner*, 71 T.C. 32 (1978). In addition, some repetitiveness is inevitable because sec. 601.201(n)(5)(ii), *supra*, and sec. 5.03, Rev. Proc. 76–33, 1976–2 C.B. 655, 656, both require all of the facts upon which an organization's claim for exemption is based to be submitted at the initial level of consideration during the administrative process.

[18]Sec. 1.501(c)(3)–1(d)(5)(i), Income Tax Regs., provides in part:

"the term 'scientific', as used in section 501(c) (3), includes the carrying on of scientific research in the public interest. * * * For research to be 'scientific', within the meaning of section 501(c)(3), it must be carried on in furtherance of a 'scientific' purpose. The determination as to whether research is 'scientific' does not depend on whether such research is classified as 'fundamental' or 'basic' as contrasted with 'applied' or 'practical'. * * * "

regulations do provide that practical or applied research, advancing technology, may be just as scientific as fundamental or theoretical research which advances basic science. Sec. 1.501(c)(3)–1(d)(5)(i), Income Tax Regs. See *Edward Orton, Jr., Ceramic Foundation v. Commissioner*, 56 T.C. 147 (1971) (manufacturer of standard pyrometric cones used in testing ceramics); *American Society of Cinematographers, Inc. v. Commissioner*, 42 B.T.A. 675 (1940).[19] However, the breadth of this definition is limited by the provision that scientific research does not include activities ordinarily carried on as part of commercial or industrial operations, such as inspection, testing, or design. Sec. 1.501(c)(3)–1(d)(5)(ii), Income Tax Regs.

Besides qualifying as "research," for an activity to qualify as scientific, it must also benefit the public. The regulations provide that scientific research will be regarded as benefiting the public if it is "carried on for the purpose of aiding a community or geographical area by attracting new industry to the community or area or by encouraging the development of, or retention of, an industry in the community or area." Sec. 1.501(c)(3)–1(d)(5)(iii)(*a*)(*4*), Income Tax Regs.

The administrative record shows that petitioner, both alone and in conjunction with various public agencies, will conduct experiments in soil management, crop selection and rotation, timber growth, wildlife management, and ecological conservation. This research is no less scientific because it is practical and carried out on a large scale. Virtually all of the agencies working with petitioner to develop programs for the use of its land indicated a real need for full-scale testing of the techniques and theories they advocated.

We find the broad public benefit of petitioner's experimental programs to be equally apparent. One of petitioner's fundamental purposes in operating an ecologically sound experimental demonstration farm is to benefit the community industry of farming. In addition, petitioner's research will be carried out in conjunction with various agencies already dedicated to serving the public. Furthermore, petitioner's conservation work actively furthers the public policies expressed by Congress in the National Environmental Policy Act of 1969, 42 U.S.C. secs. 4321–

---

[19]See also sec. 1.513–1(d)(4)(ii), Income Tax Regs. (dairy herd maintained for scientific research); Rev. Rul. 71–506, 1971–2 C.B. 233 (engineering society formed to study heating, ventilating, and air conditioning).

4361 (1976), by emphasizing the restoration of depleted natural resources to productive use, rather than merely preventing ecological damage.[20]

Finally, we do not think petitioner's activities resemble those typically incidental to commercial farming, precluding a finding of "scientific research" under section 1.501(c)(3)–1(d)(5)(ii), Income Tax Regs. See *Underwriters' Laboratories v. Commissioner*, 135 F.2d 371 (7th Cir. 1943), cert. denied 320 U.S. 756 (1943). The record shows the ordinary farm in petitioner's community is devoted to repetitive cash crops such as tobacco without regard to conservation of the ecology or reserving lands to protect the watershed and enhance the wildlife habitat.

We therefore hold petitioner is operated for scientific purposes within the meaning of section 501(c)(3).

We next consider whether petitioner is also operated for educational purposes. The regulations define "educational" as relating to training individuals or to "The instruction of the public on subjects useful to the individual and beneficial to the community." Sec. 1.501(c)(3)–1(d)(3)(i)(*b*), Income Tax Regs. Thus, public informational programs may qualify as educational under section 501(c)(3).[21] Respondent does not dispute that petitioner's function as a demonstration farm may serve educational purposes. Rather, respondent contends the record does not establish how petitioner will carry out its alleged educational activities. However, we conclude this argument simply disregards far too much of the administrative record.

---

[20]42 U.S.C. sec. 4331 (1976), provides in part:

Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further *the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man,* declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, *in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony,* and fulfill the social, economic, and other requirements of present and future generations of Americans. [Emphasis added.]

[21]See generally Rev. Rul. 72–560, 1972–2 C.B. 248 (organization educates public and prevents environmental deterioration through workshops, exhibits, and operation of a solid waste recycling center); Rev. Rul 68–14, 1968–1 C.B. 243; Rev. Rul. 68–17, 1968–1 C.B. 247 (model demonstration housing program); Rev. Rul. 68–117, 1968–1 C.B. 251; Rev. Rul. 67–216, 1967–2 C.B. 180 (annual public agricultural fair); Rev. Rul. 67–292, 1967–2 C.B. 184. See also Rev. Rul. 68–15, 1968–1 C.B. 244; Rev. Rul. 68–70, 1968–1 C.B. 248.

The record states petitioner intends to open its facilities to the farming community and the general public on specified visiting days which will be well publicized over radio and through the local newspaper. The local newspaper will also be employed to inform the public generally about petitioner's experimental farming methods, hunting and fishing rules, and other activities. We see no reason to doubt petitioner will indeed engage in these activities or to doubt they will accomplish their purpose of meaningfully informing the public about petitioner's activities.

In addition, we believe petitioner may reasonably rely on the public agencies and educational institutions using its lands for research or demonstration tours to ensure that information about its operations will reach the *interested public*. Such agencies regularly provide specialized information to the public and are sought out by those with particular questions. Moreover, reliance upon such agencies will be highly cost-effective for petitioner, whose cash resources are limited.

We therefore hold petitioner is operated for educational purposes within the meaning of section 501(c)(3).

Since petitioner's activities qualify it for exemption as a scientific and educational organization, we need not decide whether petitioner is also operated for "charitable" purposes because its activities benefit the community and the general public.[22]

Finally, we address the question whether petitioner is operated *exclusively* for exempt purposes. As interpreted by the Supreme Court, "exclusively * * * plainly means that the presence of a single [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] purposes." *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). Thus, we have held that because conducting a trade or business is not an exempt purpose, commercial enterprises are not exempt under section 501(c)(3). *Federation Pharmacy Services, Inc. v. Commissioner*, 72 T.C. 687 (1979); *est of Hawaii v. Commissioner*, 71 T.C. 1067 (1979); *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352 (1978). Our inquiry does not end there, however, because it is also clear that a trade or business may be carried on for exempt purposes.

---

[22]Cf. Rev. Rul. 78–384, 1978–2 C.B. 174.

Sec. 1.501(c)(3)–1(e), Income Tax Regs. *Industrial Aid for the Blind v. Commissioner*, 73 T.C. 96 (1979); *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. 202, 211 (1978). See *Monterey Public Parking Corp. v. United States*, 481 F.2d 175 (9th Cir. 1973); *Elisian Guild, Inc. v. United States*, 412 F.2d 121 (1st Cir. 1969). The critical question, therefore, is what is the purpose of the activity, not its nature. See generally *Federation Pharmacy Services, Inc. v. Commissioner, supra; Pulpit Resource v. Commissioner*, 70 T.C. 594 (1978).

Respondent argues, much as he did with respect to the organizational test, that petitioner is operated for the substantial nonexempt commercial purpose of farming. Petitioner argues its farming operations are conducted entirely for exempt purposes. We agree with petitioner.

Petitioner admittedly raises crops which it sells at a profit in the usual markets. However, it is plain from the record that the purpose of this activity is to demonstrate the commercial viability of petitioner's modern, ecologically sound farming techniques and alternatives to established cash crops. See, e.g., sec. 1.513–1(d)(4)(ii), Income Tax Regs.; Rev. Rul. 72–560, 1972–2 C.B. 248 (solid waste recycling centers operated to educate public and protect environment); Rev. Rul. 68–17, 1968–1 C.B. 247 (model demonstration housing program for low income families). Furthermore, all profits from crop sales will be retained by petitioner to finance its other conservation activities and to help maintain contact with the public. In short, nothing in the record indicates petitioner's agricultural activities are commercially motivated.

We therefore hold petitioner is not operated for the substantial nonexempt purpose of farming for profit.

### Private Benefit Test

The final issue we decide is whether petitioner is operated for private rather than public benefit. The statute requires that to qualify for exemption under section 501(c)(3), "no part of the net earnings of [the organization may inure] to the benefit of any

private shareholder or individual." Thus, petitioner must demonstrate its operations serve public rather than private interests.[23] *est of Hawaii v. Commissioner*, 71 T.C. 1067 (1979).

Respondent argues petitioner serves the private interests of either F. Dumaine, the trust settlor, or Amoskeag Co., with which F. Dumaine and trustees D. Dumaine and Albert Hunt are associated. Respondent's contention F. Dumaine will personally benefit is based primarily on the fact petitioner continues work started by F. Dumaine on his private farmlands. Respondent thus argues petitioner was created to perform research for the benefit of F. Dumaine's farming operations.[24] See, e.g., *Universal Oil Products Co. v. Campbell*, 181 F.2d 451 (7th Cir. 1950), cert. denied 340 U.S. 850 (1950); *Underwriters' Laboratories v. Commissioner*, 135 F.2d 371 (7th Cir. 1943), cert. denied 320 U.S. 756 (1943); *Best Lock Corp. v. Commissioner*, 31 T.C. 1217 (1959). Petitioner argues F. Dumaine benefits no more than other local farmers. We agree with petitioner.

Respondent's argument ignores the facts that petitioner's land is generally representative of the land in its area, not merely that of F. Dumaine, and that a significant portion of petitioner's activities will be devoted to disseminating the results of its experiments to the public. Petitioner's articles expressly prohibit the use of trust assets for private benefit. Furthermore, we do not think petitioner's activities are per se nonexempt because some of them were once performed by an individual. Any benefits F. Dumaine derives are only those available to the general public. See *Monterey Public Parking Corp. v. United States*, 481 F.2d 175 (9th Cir. 1973); *National Assoc. for Alternative Schools v. Commissioner*, 71 T.C. 118 (1978); *San Francisco Infant School v. Commissioner*, 69 T.C. 957 (1978); *Estate of Robinson v. Commissioner*, 1 T.C. 19 (1942).

In short, we think the administrative record affirmatively demonstrates F. Dumaine will not benefit privately from petitioner's activities.

---

[23]The prohibition against private benefit would also follow from the requirement that operations be *exclusively* for exempt purposes. *Western Catholic Church v. Commissioner*, 73 T.C. 196, 209 n. 27 (1979); *Lowry Hospital Association v. Commissioner*, 66 T.C. 850, 857 n. 8 (1976). See sec. 1.501(c)(3)–1(c)(2) and (d)(1)(ii), Income Tax Regs.

[24]Respondent argues petitioner will serve F. Dumaine's *commercial* private interests, not his *personal* private interests, e.g., *Callaway Family Association v. Commissioner*, 71 T.C. 340 (1978); *Ginsberg v. Commissioner*, 46 T.C. 47 (1966).

Respondent's contention that Amoskeag Co.[25] may benefit from petitioner's research activities is based entirely upon respondent's question and petitioner's answer:

*Q.* Describe in detail your relationship to the Amoskeag Company and the character and nature of their business activities.

A. The Amoskeag Company has no legal or other relationship to Dumaine Farms.

Respondent describes petitioner's answer as evasive and unresponsive and suggests that because Amoskeag might be in the farming or lumber business, petitioner's research is performed for Amoskeag's benefit.

We think respondent constructs this "inference" out of whole cloth; it is completely unsupported by the record. Respondent never questioned petitioner's answer nor asked for further information about Amoskeag during the administrative process.[26] Thus, this issue is unambiguously resolved by petitioner's answer which we find no reason to doubt. Petitioner stated it had no relationship to Amoskeag Co. Since there is no evidence in the record tending to contradict this statement, petitioner has established it is not operated for Amoskeag's benefit.

We therefore hold petitioner is not operated for private benefit.

For all of the above reasons, we hold petitioner is organized and operated exclusively for educational and scientific purposes as those terms are used in section 501(c)(3) and is therefore exempt from taxation under section 501(a).

To reflect the foregoing,

*An appropriate decision will be entered.*

---

[25]Amoskeag Co. is a publicly listed corporation whose shares are traded in the "Over-the-Counter" market (NASDAQ).

[26]Because this issue was raised for the first time on brief and was not mentioned in either respondent's proposed adverse determination letter or in his answer to the petition, there would be ample precedent for us to refuse to consider this issue at all. *Peoples Translation Service v. Commissioner,* 72 T.C. 42 (1979); *Goodspeed Scholarship Fund v. Commissioner,* 70 T.C. 515 (1978).