WASHINGTON RESEARCH FOUNDATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Washington Research Foundation v. Commissioner
Docket No. 29901-82X.
United States Tax Court
T.C. Memo 1985-570; 1985 Tax Ct. Memo LEXIS 60; 50 T.C.M. (CCH) 1457; T.C.M. (RIA) 85570; November 21, 1985. William H. Gates,David H. Binney and Trenholme J. Griffin, for the petitioner. Joan R. Domike, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge:Petitioner, Washington Research Foundation (Foundation), seeks a declaratory judgment pursuant to section 7428(a) [1] that it is an organization exempt from taxation under section 501(c)(3). The issues presented for decision are: (1) Whether the Foundation, as described in its application for exemption and related documents, is operated exclusively for charitable, scientific, or educational purposes within the meaning of section 501(c)(3); and (2) whether the Foundation is a feeder organization within the meaning of section 502. FINDINGS OF FACT This case was submitted for decision on the stipulated administrative record under Rules 217 and 122. [2] The facts and representations contained *62 in the administrative record, which are assumed to be true for purposes of this proceeding, are incorporated herein by this reference. Petitioner is a corporation incorporated on July 20, 1981, under the law of the Washington Non-Profit Corporation Act. At the time of the filing of the petition in this case, petitioner's principal place of business was in Seattle, Washington. Petitioner applied for recognition as a tax-exempt organization under section 501(c)(3) on December 18, 1981, with the Office of the District Director of Internal Revenue at Seattle, Washington. On May 25, 1982, the Internal Revenue Service (Service) issued an initial adverse ruling on petitioner's application. Petitioner then filed a protest to the initial adverse ruling on June 15, 1982. A conference was held in Washington, D.C., and petitioner submitted additional documentary evidence for consideration. On October 20, 1982, the Service issued a final adverse ruling to petitioner denying it recognition of tax-exempt status under section 501(c)(3). Thus, petitioner has exhausted its administrative remedies as required *63 by section 7428(b)(2). During December 1981, when petitioner first applied for recognition of exempt status, it had essentially not engaged in any operations. Petitioner was also not operational nor had it performed any of its licensing function by the date of its final submission into the administrative record, as enlarged by the Court's Order of September 19, 1983. Thus, our findings are based mainly on proposed operations and on actual operations, to the very limited extent that they have occurred. Petitioner's Articles of Incorporation include the statement that the purpose of the organization is to operate exclusively for the benefit of educational or scientific research institutions located within Washington State which are exempt from income taxation under section 501(c)(3). Further, petitioner intended to assist and facilitate the transfer of technology from the laboratories of such nonprofit organizations to public use. In petitioner's application for tax-exempt status, the Foundation's three main goals were: (1) To financially support scientific research at colleges, universities, and research institutions; (2) to increase the rate of technology transfer from research *64 departments of universities and nonprofit research institutions to industry, particularly industry in the State of Washington; and (3) to strengthen and diversify the economy of Washington State. Petitioner proposed to assist technology transfer by obtaining patent, copyright, trade secrets, and other rights from researchers for the purpose of licensing them to third parties. Petitioner explained that it intended to do this because academic institutions and individual researchers usually do not have the resources or ability to develop a patentable product. Petitioner also planned on sponsoring seminars for researchers and members of industry to provide a technology network between the academic world and industry. Specifically, petitioner planned on presenting seminars to inform interested persons of the technological opportunities that exist and to discover what new technology is needed. Petitioner proposed to publish information for the general public regarding discoveries on which it had obtained patents. Furthermore, peritioner would publish a science newsletter once a staff was hired. All of these services would be available to industry, researchers, and the public at no *65 charge. Petitioner's original funding was a $1 million loan from Seattle-First National Bank based on the loan guarantees which the Foundation's Board of Directors had solicited. Petitioner's Board of Directors canvassed the business community in Washington to obtain financial support in the form of guarantees for the $1 million proposed loan. None of the approximately 30 guarantors are directly affiliated with petitioner. Petitioner proposed to use the loan proceeds to equip an office, to pay full-time professional help, to hire a secretary and to pay administrative expenses. Petitioner expected that its activities would eventually generate revenue, principally in the form of royalties on inventions acquired from research institutions. Petitioner planned to make agreements with research institutions under which the research institution would transfer the patentable products to petitioner, who would license them to third parties. In granting the patent licenses, petitioner would not give any preferances to any company, but priority consideration would be given to companies located in Washington State. Petitioner planned that researchers and tax-exempt organizations would *66 not be required to pay for petitioner's assistance in developing patentable products. Petitioner also planned not to charge for its seminars, publications, and other information it intended to make available to the interested public. Only third-party licensees would be required to pay for patents and other rights licensed to them by petitioner. If the revenues exceeded the cost of operation, petitioner proposed that the excess would be contributed to universities, colleges, and research institutions exempt from taxation under section 501(c)(3) to support research. The final source of support was expected from direct grants and contributions from the public. On June 7, 1982, petitioner entered into a Memorandum of Understanding with the University of Washington (University) whereby the University agreed to make its technology available to petitioner.Once the technological information was received petitioner would use its best efforts to introduce the technology into public use and to secure royalties or other compensation. After notification by petitioner, the University would assign all rights to petitioner in such technology and agree to execute any other instruments to place *67 the ownership, right, title, and interest in petitioner. Petitioner would thereafter undertake the commercialization of the technology. The basic concept of the agreement is that the major portion of the revenues received from the licensing activities would flow directly to the University after petitioner had covered its out-of-pocket expenses. The monies flowing to the University would be used for further research and to meet its obligation to the inventors. Any monies that petitioner received in excess of that required to cover expenses would be returned to the University in the form of grants for further research. For example, 62.5 percent of gross royalties from patents assigned by the University would be paid directly to that institution. Remaining royalties would be applied to petitioner's expenses, and, should any royalties remain, those funds would be donated to section 501(c)(3) organizations at petitioner's discretion. The Service denied the Foundation's exempt status in their final adverse ruling, stating: "You are not operated exclusively for exempt purposes within the meaning of section 501(c)(3) of the Code. You are operated for a substantial non-exempt purpose. *68 Furthermore, you are a feeder organization within the meaning of section 502." In short, respondent argues that petitioner is engaged in the trade or business of developing patentable products, securing patents and other rights of inventions, and licensing these products and inventions to private industry for royalty and similar income. OPINION Section 501(a) provides an exemption from Federal income tax for organizations, as described in section 501(c)(3), that are "organized and operated exclusively for * * * charitable, scientific, * * * or educational purposes." The parties raise the issue of whether petitioner is operated exclusively for exempt purposes. Resolution of this issue depends solely upon whether petitioner satisfies the operational test of section 1.501(c)(3)-1(c), Income Tax Regs.
Under the operational test, an organization will be regarded as operated exclusively for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of the exempt purposes specified in section 501(c)(3), section 1.501(c)(3)-1(c)(1), Income Tax Regs., e.g., charitable, educational, or scientific. [3] An organization will not satisfy the operational *69 test if its operation furthers a substantial commercial purpose. See, e.g., Copyright Clearance Center, Inc. v. Commissioner,79 T.C. 793, 804 (1982); Federation Pharmacy Services v. Commissioner,72 T.C. 687, 691 (1979), affd. 625 F.2d 804 (8th Cir. 1980); B.S.W. Group, Inc. v. Commissioner,70 T.C. 352 (1978). Petitioner contends that it is entitled to exempt status because it is organized and operated exclusively for the purpose of promoting scientific research. Respondent, however, argues that petitioner does not satisfy the *70 operational test because it furthers a substantial nonexempt commercial purpose of its own. Whether an entity is operated "exclusively" for exempt purposes is primarily a question of fact and must be determined on an ad hoc basis. B.S.W. Group, Inc. v. Commissioner,supra at 357. The circumstances under which we must decide this case are far from ideal. As "trier" of these facts, we are confronted with an untested administrative record replete with self-serving statements and proposals. Moreover, we are called upon to judge the operational quality of an entity, which effectively has not yet begun to operate. Petitioner nonetheless bears the burden of showing that its proposed operation and activities do not, as maintained by the respondent, constitute a licensing business of the sort which is ordinarily carried on by commercial ventures organized for profit. B.S.W. Group, Inc. v. Commissioner,supra, at 358. At the time the administrative record was submitted, the Foundation had merely been incorporated in the State of Washington, arranged for a loan and its guarantee, and held one seminar. After careful consideration of the entire record, *71 we agree with respondent that the Foundation, on this record, is not exempt within the meaning of section 501(c)(3). In determining whether an organization is operated "exclusively" for exempt purposes, we must first examine the organization's activities. In applying the operational test, the proper focus is on the purpose or purposes furthered by an organization's activities, rather than on the nature of those activities. Greater United Navajo Enterprises v. Commissioner,74 T.C. 69, 77 (1980), affd. without published opinion 672 F.2d 922 (9th Cir. 1981); B.S.W. Group, Inc. v. Commissioner,supra at 356-357. The term "exclusively" is not given a strictly literal interpretation. An organization satisfies the test if no substantial nonexempt purpose exists. Copyright Clearance Center, Inc. v. Commissioner,supra, at 804. Thus, an organization need not show that its activities solely further exempt purposes. Church in Boston v. Commissioner,71 T.C. 102, 107 (1978). An organization's activities may even constitute a trade or business provided such activities further or accomplish an exempt *72 purpose and the nonexempt activity is merely incidental to the exempt purpose. Secs. 1.501(c)(3)-1(c)(1) and 1.501(c)(3)-1(e)(1), Income Tax Regs.; Dumaine Farms v. Commissioner,73 T.C. 650, 668-669 (1980); Industrial Aid for the Blind v. Commissioner,73 T.C. 96, 101 (1979); B.S.W. Group, Inc. v. Commissioner,supra at 358. Determining whether petitioner is operated for a substantial commercial purpose is primarily a question of fact to be resolved on the basis of all the evidence presented by the administrative record. See B.S.W. Group, Inc. v. Commissioner,supra at 357 and the cases cited therein. The relevant factors in determining whether the organization's activities are to operate a commercial business producing net profits for petitioner or others include the particular manner in which the activities are conducted, the commercial hue of those activities, and the existence and amount of annual or accumulated profits. B.S.W. Group, Inc. v. Commissioner,supra at 357-358. Competition with commercial firms and whether the commercial activity is the organization's sole activity *73 are also relevant. B.S.W. Group, Inc. v. Commissioner,supra at 358-359. Another relevant factor is whether the commercial activity is in fact the only practicable way to accomplish the exempt purpose. Pulpit Resource v. Commissioner,70 T.C. 594, 611 (1978). Because petitioner proposes to engage in various activities, we must determine whether each substantial activity carried on is directed towards the accomplishment of one or more exempt purposes. Dumaine Farms v. Commissioner,supra at 663 and the cases cited therein. Petitioner contends that it is operated exclusively for scientific, educational and charitable purposes. Respondent does not agree that petitioner was operated exclusively for any of the three stated purposes. The statute (sec. 501(c)(3)) may be satisfied if petitioner is operated exclusively for any or all of the purposes stated. See sec. 1.501(c)(3)-1(a)(2), Income Tax Regs. The parties have separately addressed each of the three categories. The underlying and common thread that runs through our inquiry will be to discern whether the proposed purposes are as stated and, further, whether they are *74 for public, as opposed to commercial, purposes. First, respondent argues that petitioner does not advance scientific research because petitioner does not accomplish the research itself, but rather facilitates the matching of industry's needs, ideas and research with the academic community.Petitioner contends that its activities promote scientific research: because petitioner performs the patenting and licensing function, it reasons that the research institutions do not have to spend their budgetary funds to hire or designate their own personnel to perform this specialized function; therefore, the research institution's funds can, instead, be spent on doing the research. We do not find petitioner's reasoning to necesarily follow. The Foundation's existence will not necessarily provide any more funds for scientific research than might have been received by a university if it had individually sought patents or formed its own organization to do so. Additionally, petitioner's "return" to academic institutions may not be used by those institutions for research or scientific purposes. The major activity of petitioner seems to be geared toward two major aspects: (1) Providing patenting *75 and licensing services and (2) providing a more effective link between academic technical resources and the needs of the marketplace. The second aspect may, in theory, be viewed as benefiting the academic research institutions and the public indirectly through the availability of better goods and products produced by the licensees in the business community. Assuming that petitioner's proposed purposes materialize, there may be some public benefit, but we have difficulty following the contention that petitioner's activities are "scientific." We point out, however, that research is not the only activity that can be "scientific." Edward Orton, Jr., Ceramic Foundation v. Commissioner,56 T.C. 147 (1971) (manufacture and sale of ceramic supplies for industrial use and scientific research); Science & Research Foundation, Inc. v. United States,181 F. Supp. 526 (S.D. Ill. 1960) (publication of scientific booklets). Unfortunately, we are unable to find that petitioner's activities fit into these categories. Accordingly, we find that petitioner's activities are not "scientific" within the meaning of section 501(c)(3). Second, respondent argues that petitioner's *76 activity of bringing researchers and industry members together is not the type of activity that advances education. We disagree. It is petitioner's intent to provide a clearinghouse of information to cause the exchange of available and needed technology. Petitioner proposed to publish a science newsletter, sponsor seminars, and publish information for the general public at no cost. Petitioner has already cosponsored a seminar and workshop to educate researchers on the practical applications of their research and to discover new areas to research. It is clear that informational programs may qualify as educational under section 501(c)(3). Dumaine Farms v. Commissioner,supra at 667. [4] Accordingly, some of petitioner's proposed activities are educational in nature because they make available to the public information regarding scientific advances and needs, and help researchers and business to build upon prior research. See sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs. Here we must again point out that petitioner's educational activity would no longer comport with the meaning and intent of section 501(c)(3) if the purpose of its informational and clearinghouse *77 activity was to serve the commercial interest of the licensees rather than the academic community and the public. In this regard, note is taken of the fact that local businesses guaranteed the proposed $1 million loan. Third, respondent argues that petitioner's activities are not charitable because any benefit the community at large receives is, at best, indirect. Although respondent's point *78 is well taken, petitioner's intent to promote scientific research and to remit any receits over its cost to universities is somewhat underrated by respondent. Petitioner may encourage researchers to work in areas where a dublic need exists. Respondent argues that the immediate benefit of these activities redounds to private industry and the research institutions because petitioner's activity of patenting new products on a restrictive basis to selected manufacturers is directed toward benefiting those particular manufacturers. Thus, any benefit to the State of Washington must be considered indirect. In this regard we agree with respondent. It would appear that petitioner's activities will provide revenue to "501(c)(3) organizations," but, more likely be a clearinghouse for academic technology for the direct benefit of Washington State businesses. We now consider whether petitioner is operated for a substantial commercial purpose. Respondent concludes that petitioner is operated in furtherance of a substantial commercial purpose. In view of the record, as a whole, we conclude that the very nature of petitioner's major activities are commercial. Petitioner states it will attempt *79 to license the patent to the user or users who will most effectively disseminate the discovery to the public rather than attempting to maximize profits as a commercial operation would do. This statement is not in harmony with petitioner's stated intent to maximize royalties so as to provide universities with additional funds for research. Although petitioner's plan of operation is not to limit work only to areas of research or inventions which are the most economically efficient or have the most immediate market attractiveness, its overall goal is to provide the universities with the maximum return on patents, i.e., 62.5 percent. Petitioner also plans to educate researchers and the public and encourage development of research that might never be made available to the public. There is an incongruity in petitioner's position and the record, as a whole, does not support petitioner's claim that it will not operate with the same objectives as a commercial enterprise. With respect to the existence and amount of annual or accumulated profits, both parties agree that the mere presence, or possible presence, of profits is not determinative. See Pulpit Resource v. Commissioner,supra; *80 Dumaine Farms v. Commissioner,supra;Industrial Aid for the Blind v. Commissioner,supra;Edward Orton, Jr., Ceramic Foundation v. Commissioner,supra. It is impossible to determine whether petitioner will generate profits because petitioner has not operated or received its tax-exempt status. Petitioner did set, however, a target of 37.5 percent of royalties as the amount that would meet or at least approach the expenses and overhead of the operation. Although petitioner proposed to use some of this amount for seminars, publications, and newsletters and not merely to cover its cost for patenting and licensing, the major thrust of its activity is patent development. With respect to competition with commercial firms, there is no evidence in the administrative record that petitioner would not compete with commercial firms. Petitioner contends that its clients, such as the University of Washington, will not deal with commercial firms. Respondent argues that the University of Washington is not barred from dealing with commercial firms. The administrative record, however, contains no direct evidence that the University *81 of Washington will not deal with or is prohibited from dealing with commercial firms. [5]
With respect to voluntary contributions, the record is sparse. Petitioner has not received any voluntary contributions other than the purportedly gratuitous guarantees for the $1 million loan. Petitioner intends to use the original loan to set up the Foundation and once recognized as exempt, fund-raising activities are to occur. It appears that the revenues from royalties are to be petitioner's principal source of funds. Petitioner only proposes to accept patent assignments from organizations that are exempt from taxation under section 501(c)(3), but this fact does not distinguish this case from B.S.W. Group, Inc. v. Commissioner,supra. Petitioner performs a function that these institutions could otherwise *82 perform for themselves or which could have otherwise been commercially developed on behalf of the institutions. For the foregoing reasons, we conclude that petitioner is not a tax-exempt organization under section 501(c)(3) because its proposed activities are commercial in nature and not in direct furtherance of exempt purposes, being aimed at the production or maximization of profits. Because we have found that petitioner is not organized for exempt purposes, there is no need to consider respondent's argument that petitioner is a feeder organization within the meaning of section 502. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years at issue unless otherwise indicated.↩
2. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. For purposes of sec. 501(c)(3), the term "charitable" includes the advancement of education or science, sec. 1.501(c)(3)-1(d)(2), Income Tax Regs.; the term "educational" relates to the instruction or training of an individual for purposes of improving or developing that person's capabilities, or to the instruction of the public on subjects useful to an individual and beneficial to the community, sec. 1.501(c)(3)-1(d)(3)(i), Income Tax Regs.; and a "scientific" organization is an organization organized and operated in the public interest, sec. 1.501(c)(3)-1(d)(5)(i), Income Tax Regs.↩
4. See generally Rev. Rul. 72-560, 1972-2 C.B. 248 (organization educates public and prevents environmental deterioration through workshops, exhibits, and operation of a solid waste recycling center); Rev. Rul. 71-413, 1971-2 C.B. 229 (organization brings instructors and interested students together in certain community); Rev. Rul. 69-538, 1969-2 C.B. 116 (college bookstore refunds excess earnings to students and faculty members); Rev. Rul. 68-14, 1968-1 C.B. 243; Rev. Rul. 68-17, 1968-1 C.B. 247 (model demonstration housing program); Rev. Rul. 68-117, 1968-1 C.B. 251 (operated to assist needy families in "developing" countries); Rev. Rul. 67-216, 1967-2 C.B. 180↩ (annual public agricultural fair).
5. The University of Washington advised a representative of the petitioner that it was not interested in dealing with commercial firms, but there is no indication that it is prohibited from doing so. The overall significance of this fact is questionable because the University of Washington is but one of the institutions that petitioner proposes to service.↩